484 A.2d 612

AUTOMOBILE TRADE ASSOCIATION OF
MARYLAND et al.

v.

HAROLD FOLK ENTERPRISES, INC. t/a
United Buying Services.

No. 97, Sept. Term, 1983.

Court of Appeals of Maryland.

Dec. 7, 1984.

Motion for Reconsideration Denied Jan. 7, 1985.

644

Stephen C. Winter, Towson (Eugene W. Cunningham, Jr. and White, Mindel, Clarke & Hill, on brief, Towson), for appellants, Automobile Trade Ass'n of Maryland, Inc., Gladding Chevrolet, Inc. and Tate Chrysler Plymouth Inc.

Avery Aisenstark, Asst. Atty. Gen., Stephen H. Sachs, Atty. Gen., Kathleen Howard Meredith, Asst. Atty. Gen., and Lynette M. Phillips, State Atty., for appellant, State of Maryland.

Ronald H. Jarashow, Annapolis (Franch, Earnest & Cowdrey, P.A., Annapolis, on brief), for appellee.

Argued before MURPHY, C.J., COLE, DAVIDSON *, RODOWSKY and COUCH, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals (retired), specially assigned and JAMES C. MORTON, Jr., Associate Judge of the Court of Special Appeals (retired) specially assigned.

COLE, Judge.

The central issue we must decide in this case is whether referral agents of United Buying Service (UBS), an automobile referral sales business, must satisfy the licensure requirements for vehicle salesmen under Md.Code (1984 Repl. Vol.) §§ 15–401 to –412 of the Transportation Article.

We recount those facts necessary to place this issue in proper perspective. UBS is an automobile referral sales business with operations in Virginia, New York, Colorado, the District of Columbia, and, since 1967, Maryland. UBS arranges sales of new vehicles to individuals belonging to member-groups, such as companies, labor organizations, and other similar entities. These individuals contact a UBS referral agent after locating a desired vehicle in the UBS price book, which lists various makes and models of new vehicles at a price that is discounted from the dealer's normal list price. The individual provides the UBS referral agent with information concerning the desired automobile, such as the make, model, and options. In return, the UBS referral agent sends the customer a "purchase certificate" for that vehicle. The referral agent instructs the customer to take the certificate to a dealer who has agreed to accept UBS referrals under a verbal agreement between UBS and the dealership. Under this agreement, the dealer must sell that vehicle to the customer at the UBS price. As consideration for UBS referrals, the dealer pays UBS $30.00 per sale.

---

* Davidson, J., participated in the hearing of the case and in the conference in regard to its decision, but died prior to the adoption of the opinion by the Court.

Approximately ninety percent of UBS's business is derived from automobile referrals, with the remaining ten percent derived from furniture referrals. The Chevy Chase—based organization employs about twenty five individuals, most of whom are UBS referral agents. UBS referral agents are responsible for dealing with prospective customers, often over the telephone, concerning vehicles listed in the UBS price book. UBS hires and trains these referral agents, and pays their salaries, workmen's compensation insurance, medical benefits, and other expenses. All UBS referral agents transact business from the Chevy Chase office.

On the basis of a 1982 opinion by the Attorney General, the Motor Vehicle Administration (MVA) informed UBS that it would not renew the licenses of its referral agents, which were due to expire on April 30, 1983. In response, UBS filed a declaratory judgment action in the Circuit Court for Anne Arundel County seeking injunctive and mandamus relief against the MVA. The Automobile Trade Association of Maryland (ATA), an association of new automobile dealers, intervened in this suit. The trial court found that UBS referral agents were required to be licensed because they were "vehicle salesmen," and that these referral agents met the licensure requirements because they were "employed by" licensed dealers. Accordingly, on April 28, 1983, the trial court ordered that the MVA renew the licenses of the UBS referral agents. The MVA appealed to the Court of Special Appeals but we granted certiorari before judgment was entered by that Court.

I

Before we can reach the merits of this case it is necessary for us first to analyze a procedural issue raised by the appellants. In its opinion and order, the trial court made several findings to which the appellee did not file a cross-appeal. Appellants argue that the appellee's failure to file a cross-appeal bars appellate review of the trial court's finding that UBS referral agents are "vehicle salesmen" within

the meaning of § 15–101(e) of the Transportation Article and are thus required to be licensed under Maryland law.

The Maryland Rules do not contain extensive requirements for cross-appeals. For review by this Court, Maryland Rule 812 b provides in general that any other party may file a petition for writ of certiorari within ten days of the filing of the first timely petition for writ of certiorari or within the time specified in Maryland Rule 812 a. Similarly, for appeals to the Court of Special Appeals, Maryland Rule 1012 f generally requires any other party to file an order for appeal within ten days from the date on which the first order for appeal was filed. Despite the lack of detailed guidance in the rules, we have discussed on numerous occasions when a cross-appeal properly lies. *E.g., Joseph H. Munson Co. v. Secretary of State,* 294 Md. 160, 448 A.2d 935 (1982), *aff'd,* — U.S. —, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984); *Offutt v. Montgomery County Bd. of Educ.,* 285 Md. 557, 404 A.2d 281 (1979).

 As a general matter, a party to a trial court proceeding must file a valid, timely order of appeal to seek direct appellate review and reversal of the trial court's judgment. *See Joseph H. Munson Co. v. Secretary of State, supra,* 294 Md. at 168, 448 A.2d at 939–40. In *Munson,* we held that an appellee could not assert on appeal that the appellant lacked standing to challenge the constitutionality of a statute because the appellee failed to file a cross-appeal from a declaratory judgment that upheld the validity of that statute. *Id.* at 168, 448 A.2d at 940. In writing for the *Munson* Court, Judge Eldridge reasoned that the lack of standing could not be raised for the first time by the appellee on appeal because lack of standing would not serve as an alternate ground for affirming the trial court's decision on the merits. Conversely, where a party has an issue resolved adversely in the trial court, but receives a wholly favorable judgment on another ground, that party may, as an appellee and without taking a cross-appeal, argue as a ground for affirmance the matter that

was resolved against it at trial. *Offutt v. Montgomery County Bd. of Educ., supra,* 285 Md. at 564 n. 4, 404 A.2d at 285 n. 4; *State Comm'n on Human Relations v. Amecom Div.,* 278 Md. 120, 123 n. 2, 360 A.2d 1, 3 n. 2 (1976). In *Offutt,* the appellee school board received a judgment wholly in its favor, although the trial court ruled that it had bargained in bad faith. The school board filed a cross-appeal. Under these circumstances, we determined that the cross-appeal was inappropriate because a finding of good faith would have been an alternate ground to support the trial court's ruling. In *Amecom Div.,* we noted that the appellee was not required to file a cross appeal to assign any error of the trial court in support of the final decree when the appellee seeks only affirmance of that final decree.

█ In light of these principles, it is apparent to us that the appellee in the case *sub judice* was not required to file a cross-appeal to argue in this Court that its referral agents are not "vehicle salesmen" under § 15–101(e) of the Transportation Article. The appellee received a judgment wholly in its favor at trial insofar as that court denied the relief sought by appellants. Without taking a cross-appeal, appellee may argue as a ground for affirmance the matter that was resolved against it at trial. Thus, appellee can argue that we should affirm the trial court's final order on an alternate ground, i.e., that the UBS referral agents do not come within the definition of vehicle salesmen and therefore do not have to be licensed. Although this issue was resolved against appellee at trial, it nevertheless provides an alternate ground for affirmance. We therefore hold that the appellant's contention that appellee is barred from raising the contested issues because no cross-appeal was taken is without merit.

## II

UBS and Maryland's vehicle salesmen licensing laws have often been at odds since UBS initiated its Maryland opera-

tion in 1967. Barely one year after UBS's foray into Maryland, the MVA issued a bulletin to all automobile dealers on May 21, 1968, indicating that they should not enter into selling arrangements with any person not licensed or bonded in accordance with Maryland law. At the MVA's request, the Attorney General of Maryland issued an opinion on the matter. The Attorney General opined that consumer buying services were "salesmen" under former Md.Code 1957, 1967 Repl.Vol.), Art. 66½, § 2(49a) (current version at Md.Code (1984 Repl.Vol.), § 15-101(e) of the Transportation Article) and that dealers could not participate in an automobile sales transaction with an unlicensed buying service without violating the applicable licensing laws. 53 Op. Att'y Gen. 402 (1968). On November 20, 1968, MVA directed UBS to cease and desist its operations. After discussions between UBS and the MVA, UBS modified its purchase certificate by having it state that UBS was the agent of the purchaser, not the dealer. Based on this modification, the MVA approved the UBS operation on January 2, 1969.

In 1970, the General Assembly undertook an extensive revision of Maryland's motor vehicle laws. This revision expanded the definition of "vehicle salesmen" to include an individual who "induces or attempts to induce any person to buy or exchange" a vehicle and who "receives or expects to receive" any "value from either the seller or purchaser" of a vehicle. Chapter 534 of the 1970 Laws of Maryland (codified at Md.Code (1957, 1970 Repl.Vol.), Art. 66½, § 1-210) (definition of "vehicle salesman"). Based on this new definition, the MVA again issued a bulletin that advised automobile dealers not to operate in conjunction with buying services that induce or attempt to induce the sale of vehicles, unless the representative of the buying service holds a valid salesman's license covering employment by a particular registered dealer. Bulletin from Chief, Dealer Licensing Services, Maryland Dept. of Motor Vehicles (June 16, 1971).

Shortly after the issuance of this bulletin UBS filed suit in the Circuit Court for Montgomery County seeking an injunction prohibiting the MVA from advising dealers not to transact business with UBS and a declaration that the licensing laws were inapplicable to UBS and, moreover, were unconstitutional. Settlement negotiations resulted in what the parties characterize as an "accommodation letter" between UBS and MVA. Under the terms of this May 5, 1972 letter from the Deputy Administrator of the MVA to UBS's counsel, the MVA explained that UBS would be in compliance with the licensing laws if the UBS representatives became licensed vehicle salesmen. To accomplish this UBS representatives had to be licensed through, and bonded by, a licensed dealer. UBS followed this procedure for the next decade, at which time the Attorney General issued an opinion adverse to UBS. This opinion, requested by the Secretary of Transportation, dealt with whether UBS referral agents had to comply with the appropriate licensure requirements. 67 Op.Att'y Gen. 393 (1982). The Attorney General noted that Maryland's licensing and regulatory requirements fail to accommodate adequately the operation of automobile buying referral services such as UBS, and that these businesses are unauthorized to the extent that they receive or expect to receive compensation for their referrals. More specifically, the Attorney General stated that UBS referral agents are "vehicle salesmen," but that they are ineligible for licenses because they are not "employed" by licensed dealers as required under § 15–404. The opinion concluded:

In summary, it is our opinion that the statutory licensing scheme does not permit the operation of car buying/referral services in the manner described above. The licensing scheme makes it lawful only for licensed dealers and their licensed salesmen to participate in vehicle sales in Maryland. Furthermore, the General Assembly has long required that, as a condition on which a salesman's license may be granted, the salesman must be an employee of the dealer, not some other entity. The mere align-

ment of buying/referral service staff members as vehicle salesmen with a dealer does not satisfy this employment requirement.

This opinion in turn precipitated the appellee's declaratory judgment action and this subsequent appeal.

A

Central to our analysis is whether UBS referral agents are vehicle salesmen within the meaning of § 15–101(e) of the Transportation Code. The statute provides:

(e) *Vehicle Salesman.*—(1) "Vehicle salesman" means, except as provided in paragraph (2) of this subsection, any individual who:

(i) For a commission or other compensation, under any form of agreement or arrangement with a dealer, buys, sells, or exchanges or negotiates or attempts to negotiate a sale or exchange of an interest in a vehicle of a type required to be registered under Title 13 of this article; or

(ii) Induces or attempts to induce any other person to buy or exchange an interest in a vehicle of a type required to be registered under Title 13 of this article and receives or expects to receive a commission or other compensation from either the seller or the buyer of the vehicle.

(2) "Vehicle salesman" does not include:

(i) A person described in subsection (b)(2) of this section; or

(ii) An individual acting as a representative of a person described in subsection (b)(2) of this section.

Based on this definition, the trial court determined that UBS's referral agents fall within the definitional purview of § 15–101(e)(ii) because these agents induce or attempt to induce automobile sales. The parties correctly note that the meaning of "induce" and "attempts to induce" as used within that statute is of critical importance in ascertaining whether the referral agents are vehicle salesmen. Because

the Transportation Article does not define these terms, we must resort to well-settled canons of statutory construction to determine their meaning.

As we have often stated:

[I]t is the duty of the courts to declare the law as the General Assembly has made it, that is, to ascertain and give effect to the intention of the legislature. This we have said on many occasions is the cardinal rule of statutory construction. In ascertaining the legislative intent we look to the language used, and when such language is clear and unambiguous, it must be held to mean what it expresses. However, where the language is ambiguous and of doubtful import, the duty of the courts is to ascertain and give effect to the true legislative intent. In short, the judicial function of statutory construction lies wholly within the domain of ambiguity and uncertainty. When exercising this function the courts may resort to extrinsic aids such as examining the history of the passage of the law, the reports of committees and commissions, the introduction of amendments and testimony given before legislative committees. As we said in *Berry v. State*, [287 Md. 491, 496, 413 A.2d 557 (1980)], "where the statutory language is of doubtful meaning, the Court must venture beyond the words of the statute and consider the subject matter of the statute, the purpose underlying its enactment, and the object sought to be accomplished[.]"

*Bledsoe v. Bledsoe*, 294 Md. 183, 188–89, 448 A.2d 353, 356 (1982) (citations omitted); *see Board of Examiners in Optometry v. Spitz*, 300 Md. 466, 474, 479 A.2d 363, 367 (1984); *City of Baltimore v. Hackley*, 300 Md. 277, 283, 477 A.2d 1174, 1177 (1984). In light of these well-settled rules, we must determine the meaning of "induce" and "attempts to induce" as those terms are used in § 15–101(e)(ii) of the Transportation Article.[1]

---

**1.** Very few states have statutes that mirror the "induce" or "attempts to induce" language used in the Maryland vehicle salesman licensure

Dictionary meanings are a useful source in determining the "natural and ordinary signification" of the terms involved. *Webster's Third New International Dictionary* 1154 (1976) defines "induce" in the following manner:

1a: to move and lead (as by persuasion or influence ...: prevail upon: INFLUENCE, PERSUADE ... b: to inspire, call forth, or bring about by influence or stimulation ... 3a: to bring on or bring about: EFFECT, CAUSE

 ✄ &ast; &ast; ✄ &ast; &omega;

syn PERSUADE, PREVAIL: INDUCE may indicate overcoming indifference, hesitation, or opposition, usu. by offering for consideration persuasive advantages or gains that bring about a desired decision ... PERSUADE may suggest a winning over by an appeal, entreaty, or expostulation addressed as much to feelings as to reason ... PREVAIL may be used in situations in which strong opposition or reluctance is overcome by sustained argument and entreaty[.]

Although induce, persuade, and prevail are considered synonyms, *"induce* suggests a subtler leading of a person to a course of action so that the decision seems finally to come from him[.]" *Webster's New World Dictionary* 1062 (2d ed. 1982). A leading law dictionary further defines induce as "[t]o bring on or about, to affect, cause, to influence to an act or course of conduct, lead by persuasion or reasoning, incite by motives, prevail on." *Black's Law Dictionary* 697 (5th ed. 1979).

These definitions of induce suggest that that term is susceptible to either a restrictive or expansive interpretation. Under a restrictive interpretation, the action taken must actually accomplish the goal, which in this case is the sale of a new vehicle. A less restrictive interpretation would be that the action taken lead or influence one toward

---

statute. *E.g.,* Cal.Vehicle Code § 675 (West Supp.1984) (no judicial interpretation of these terms to date).

the desired goal. Irrespective of the appellee's argument that "induce" be given a restrictive meaning, it is clear to us that the General Assembly intended a significantly broader meaning by its use of the language "attempts to induce." Appellee seeks to avoid the effect of this language by urging that we give "attempt" its criminal law meaning of a specific intent to do a criminal act. This argument is pure sophistry because it disregards the natural and ordinary signification of the term "attempt." The fallacy in appellee's contention is best illustrated by the definition of "attempt": *"In statutes and in cases other than criminal prosecutions* an 'attempt' ordinarily means an intent combined with an act falling short of the thing intended. It may be described as an endeavor to do an act, carried beyond mere preparation, but short of execution." *Id.* at 116 (emphasis supplied.) Another dictionary defines "attempt" as follows: "to make an effort to do, accomplish, solve, or effect . . .—often used in venturous or experimental situations sometimes with implications of failure[.]" *Webster's Third New International Dictionary, supra,* at 140.

■ These definitions, together with our obligation to ascertain and carry out the real legislative intent, compels us to conclude that UBS referral agents induce or attempt to induce vehicle sales within the meaning of § 15–101(e)(ii) of the Transportation Article. The act of referring a customer to a specific vehicle dealer or dealers serves "to influence," "to bring on or about", "to affect," and "to aid" the sale of a vehicle by that dealer to that particular customer. The customer expects to receive a lower purchase price and a faster transaction as the result of the referral made by the UBS agent. The expectation of these special services and benefits are presumably not readily available at other dealers. Indeed, one dealer testified that UBS referred customers enjoy savings between $800—$2,000 over non-UBS customers. Of course, a sale does not always have to result by virtue of the referral because the

statute uses the language "attempts to induce." *See* 67 Op.Att'y Gen., *supra,* at 401–02.

Appellee discounts this reasoning by maintaining that its operation simply facilitates or carries out a purchase already decided upon by the buyer. This argument proves too little. As an initial matter, assuming *arguendo* that the customer may have already decided to purchase a specific automobile before contacting a UBS referral agent, the customer has obviously not decided from which dealer to purchase the vehicle. By referring the customer to a specific dealer, the UBS referral agent induces or attempts to induce the sale of a vehicle between that dealer and that customer. The argument also proves too much because it rests on the unsupported proposition that every customer who contacts a UBS referral agent has already firmly decided upon the desired vehicle's make, model, options, and accessories. Although there was testimony to the effect that UBS referral agents never discuss the price or options with potential customers, other testimony indicated that referral agents would apprise potential customers of recent price increases not reflected in the UBS price book. In addition, the UBS price book, which was offered into evidence, clearly encourages customers to contact UBS referral agents to discuss its contents. Taken collectively, the actions on the part of the UBS referral agents have the effect of advancing the sales process. We therefore hold that the trial court did not err in concluding that UBS referral agents induce or attempt to induce vehicle sales under § 15–101(e)(ii) of the Transportation Article and therefore met the first statutory criterion of vehicle salesmen.

The second criterion under § 15–101(e)(ii) provides that an individual is a vehicle salesman if he "receives or expects to receive a commission or other compensation from either the seller or the buyer of the vehicle." The trial court found that the UBS referral agents receive compensation from the seller because the salaries of the referral

agents are paid out of the proceeds received by UBS from dealers. Appellee does not contest this finding, and we cannot conclude that the trial court's finding is erroneous. We therefore hold that UBS referral agents are "vehicle salesmen" under § 15–101(e)(ii) and must therefore comply with the licensure requirements under §§ 15–401 to –412.

## B

Maryland law imposes various conditions upon the licensure of vehicle salesmen. These conditions provide, *inter alia,* that a person may not act as a vehicle salesman unless he is licensed by the MVA (§ 15–402), only individuals may apply for and be issued licenses (§ 15–403), and a person must be employed by a licensed dealer (§ 15–404). The last condition is the focus of our attention. Section 15–404 provides in pertinent part:

§ 15–404 *Employment by licensed dealer required.*

(a) *In general.*—A person may not be licensed under this subtitle [Subtitle 4. Vehicle Salesmen] unless the person:

(1) Is a licensed dealer; or

(2) Is employed as a vehicle salesman by a licensed dealer.

UBS argues that its referral agents are "employed" by licensed dealers within the meaning of this statute because they act on behalf of the licensed dealer in making the referral on the basis of an agreement between UBS and the dealer. In an alternative argument, UBS posits that its referral agents are employees of the dealer because they satisfy the criteria for an employer-employee relationship. Although UBS notes that dual employment would exist under its alternative argument, it nonetheless contends that this form of employment does not contravene the Maryland vehicle salesmen licensing statute.

Appellants counter these arguments by advancing the contrary proposition that UBS referral agents are not "employed" by licensed dealers as required by § 15–404 and are

therefore ineligible for licensure as vehicle salesmen. In support of this proposition, appellants maintain that UBS failed to present evidence sufficient to support a finding that the referral agents are employees of the dealers. With respect to appellee's dual employment argument, appellants explain that the licensure scheme contemplates that licensed dealers exercise exclusive supervision and control over their licensed vehicle salesmen. Furthermore, appellants insist that the General Assembly's recent rejection of legislation purporting to encompass automobile referral sales supports their view that the term "employed" contemplates the traditional employer-employee relationship.

The trial court considered these arguments and agreed with UBS's contention that its referral agents were "employed" by both UBS and the licensed dealer. The threshold issue we must determine, therefore, is whether the UBS referral agents are employed by licensed dealers within the meaning of § 15–404. We must thus turn our attention to that statute and adhere to the rules of statutory construction noted above.

Nowhere does § 15–404 or the Transportation Article itself define "employed." That statute, however, as well as §§ 15–405 and 15–409, uses the term in the context of the vehicle salesman—licensed dealer relationship. Appellee would have us give "employed" a meaning so broad so as to encompass any relationship between a vehicle salesman and a licensed dealer. We decline to do so because the General Assembly was careful in referring to this relationship in Subtitle 4 in terms associated with the traditional employer-employee relationship. *Cf. United Buying Serv., Inc. v. State Dep't of Revenue,* 37 Colo.App. 465, 548 P.2d 1286 (1976) (court declined to restrict term "employed" to technical employer-employee relationship, and thus found that UBS *itself* is employed by dealers; case is distinguishable from instant case because only individuals in Maryland, not corporations, are eligible for licensure as vehicle salesmen).

■ In *Mackall v. Zayre Corp.*, 293 Md. 221, 443 A.2d 98 (1982), we set forth the following five criteria to determine the existence of an employer-employee relationship:

> These [criteria] include (1) the power to select and hire the employee, (2) the payment of wages, (3) the power to discharge, (4) the power to control the employee's conduct, and (5) whether the work is part of the regular business of the employer. The decisive test in determining whether the relation of employer and employee exists is whether the employer has the right to control and direct the employee in the performance of the work and in the manner in which the work is to be done.

*Id.* at 230, 443 A.2d at 103. The trial court referred to these criteria and concluded that the UBS referral agents were employees of UBS. We agree. UBS selected, hired, and fired the referral agents, paid their wages, social security taxes, and workmen's compensation insurance, and supervised them on a day-to-day basis. Moreover, the work of the referral agents in referring potential customers to licensed dealers was a major part of UBS's regular business; the referral agents worked from UBS's sole Maryland office and used UBS clerical staff, office supplies, telephones, and stationery. In addition, UBS maintained the personnel files on the referral agents. These factors clearly indicate the existence of an employer-employee relationship between UBS and its referral agents.

The trial court further held that UBS referral agents were also the employees of the licensed dealers to whom they made referrals. This holding raises the issue of whether the referral agents are employed simultaneously by UBS and the licensed dealers and, if so, whether the licensure provisions permit this form of dual employment.

■ As an initial matter, we recognize "that, under certain circumstances, a person performing a given function simultaneously may be the employee of two employers." *Id.* at 229, 443 A.2d at 102; *see Comptroller v. Atlantic Supply Co.*, 294 Md. 213, 448 A.2d 955 (1982); *Keitz v.*

*National Paving Co.*, 214 Md. 479, 134 A.2d 296 (1957). The test for determining whether dual employment exists is whether "there is evidence to support an *inference* that more than one individual or company controls or directs a person in the performance of a given function." *Mackall v. Zayre Corp., supra*, 293 Md. at 230, 443 A.2d at 103 (emphasis supplied). Based upon this standard, we must determine whether the trial court's factual determination that the UBS referral agents are employees of both UBS and the licensed dealers is clearly erroneous in light of our review of the law and the evidence. Md.Rule 886.

▮ The decisive test in determining the existence of an employer-employee relationship is the right of the employer to control and direct the employee in the performance of the work and in the manner in which the work is to be done. *Id.* at 230, 443 A.2d at 103. Evidence adduced at trial indicated that the licensed dealers had the right to terminate their relationship with their particular UBS agent and had the right to reprimand a referral agent. The evidence also indicated that the agents were paid from the fees collected from the dealers through referrals, that the dealers assumed various responsibilities inherent in bonding their respective referral agents, and that the dealers and agents visited the other's premises. These facts were the only ones that gave rise to an inference of an employer-employee relationship between the dealers and the referral agents. We cannot agree with the trial court that these facts, considered individually or collectively, constitute an employer-employee relationship.

The control allegedly vested in the dealers is, in our view, nonexistent. The actual right to control and direct these referral agents is vested in UBS. UBS's reliance on *Mackall* is misplaced. *Mackall* did not create a *per se* rule that dual employment exists in every case where two entities affect the actions of a single employee. Instead, *Mackall* was careful to limit the dual employment rule to "certain circumstances." A careful reading of *Mackall* indicates the

important differences between that case and the case *sub judice*, and dispels the proposition that the UBS referral agents are employees of the licensed dealers.

Factually, the two employers in *Mackall*, Zayre Corporation (Zayre) and Alden Millinery (Alden), exercised substantial control over the employee (Mackall). Alden operated a concession in one of Zayre's department stores. Mackall sustained injuries when she slipped and fell while at work. In a tort action brought by Mackall against Zayre, the jury determined that Mackall was the employee of both Alden and Zayre. As such, her exclusive remedy was under the Workmen's Compensation law. We affirmed the judgment in favor of Zayre, holding that Mackall was a dual employee of Alden and Zayre. In writing for the Court, Judge Davidson noted that both entities participated in the selection, hiring, and paying of the employee. Both had the power to discharge her and, most important, both employers exercised control over Mackall in the performance of her duties. For instance. the Zayre manager exercised control over the staffing of the Alden concession and could transfer Mackall to the Zayre jewelry department during lunchtime when that department was unattended. Moreover, Mackall was subject to all the rules and regulations applicable to Zayre employees, and the Zayre manager was authorized to transfer a Zayre employee into the Alden concession when the concession was not adequately staffed.

The degree of control allegedly exercised by the dealers in the case *sub judice* pales in comparison to that in *Mackall*. Indeed, there was no evidence that the referral agents were subject to all the rules and regulations of the dealership to which they were assigned. Simply stated, no evidence was presented that the dealers engaged in the same degree of control as that exercised by the Zayre managers in *Mackall*. We therefore conclude that *Mackall* is clearly distinguishable from the instant case, and that the referral agents were not "employed" by the licensed dealers under § 15–404.

Our conclusion that the referral agents are not "employed" by the licensed dealers is buttressed by a recent Attorney General's opinion to the same effect. Although the opinion of the Attorney General interpreting legislation is not binding on this Court, it is nevertheless entitled to careful consideration. *Board of Examiners in Optometry v. Spitz, supra* 300 Md. at 476, 479 A.2d at 368. The Attorney General concluded that "[t]he mere alignment of buying/referral service staff members as vehicle salesmen with a dealer does not satisfy [the § 15–407] employment requirement." 67 Op.Att'y Gen., *supra,* at 408. Because the Attorney General recognized that his conclusion would affect the operation of a type of business that may benefit consumers, he suggested that the General Assembly adopt remedial legislation to authorize referral services to conduct business.

In response to the Attorney General's opinion of June 8, 1982, Senate Bill 729 was introduced on February 18, 1983. This bill proposed to add a "Buying Referral Services" subtitle to Title 15 of the Transportation Article. The rejection of this legislation by the Senate on April 7, 1983, intimates that the legislature acquiesced in the Attorney General's Opinion. *See Board of Examiners in Optometry v. Spitz, supra.*

Even assuming that the trial court did not err in concluding that the referral agents were "employed" by the licensed dealers, the trial court's determination that § 15–404 permits dual employment is erroneous. Our view of the Maryland licensure scheme convinces us that the legislature intended to proscribe dual employment. The General Assembly intended for a one-salesman-one-dealer exclusivity principle to govern the licensing of vehicle salesmen. This principle is illustrated by the requirement under § 15–409(b) that a licensed vehicle salesman may not solicit sales for the benefit of any seller other than the licensed dealer named in his license. In addition, § 15–408 provides that a license authorizes a licensee "to be a vehicle salesman for a li-

censed dealer during the license year for which it is issued," while § 15–405 states that a license application must include the "name and business address of the licensed dealer by whom the applicant is or will be employed." This language clearly indicates that a vehicle salesman may be employed by only one licensed dealer.

The rationale for this type of licensing scheme is to foster dealer accountability in the context of consumer transactions. We discussed briefly the purpose of this scheme in *Aero Motors v. Administrator, Motor Vehicle Admin.*, 274 Md. 567, 337 A.2d 685 (1975). In the course of upholding the constitutionality of the Maryland licensure system, we observed that the statutorily-regulated franchise-dealer system was designed to encourage accountability and thus enhance consumer protection. We further noted that the legislature intended to use some of the prevalent industry practices as a means of enforcing the licensing laws. *Id.* at 579–81, 337 A.2d at 694–96. Shortly after this decision, the United States District Court for the District of Maryland elaborated upon the *Aero Motors* rationale in a case involving a constitutional challenge brought by a brokerage referral service. *Detroit Automotive Purchasing Servs. v. Lee*, 463 F.Supp. 954 (D.Md.1978). The *Detroit Automotive* court emphasized the accountability and exclusivity principles that pervade the vehicle salesmen licensure provisions, and remarked:

In operation, this system of licensing often takes advantage of established industry practices to aid in policing the wholesale and retail market in Maryland.

In this regard, automobile dealers play an important role in policing the conduct of motor vehicle salesmen. As a condition for obtaining a license as a vehicle salesman, an individual must either be a licensed dealer himself or employed by one. § 15–404(a). Moreover, an applicant for a salesman's license must submit a written statement by a licensed dealer certifying that the salesman has in fact been accepted as the dealer's employee, § 14–404(b), and the application must include the name

and full address of the dealer, § 15–405(1). Finally, the issued license itself bears the name of the dealer by whom the salesman is employed, § 15–409(a), and the licensed salesman may not solicit sales for the benefit of any seller other than the licensed dealer named in his license, § 15–409(b).

This licensed dealer, clearly identified as a result of the licensing requirements for vehicle salesmen, is himself lawfully and professionally responsible for the conduct of the employee-salesman. Under § 15–109, the licensed dealer can, in some circumstances, lose his own license because of the misconduct of his employee. Thus, the dealer's interest in preserving the investment in a business dependent upon retaining a dealer's license serves as an incentive to monitor the practice of the employee-salesman. In this way, dealer supervision of salesmen augments the regulation of vehicle salesmen through formal MVA adjudication of customer complaints and the imposition of sanctions directly upon the salesman, either by revoking or suspending the salesman's license.

*Id.* at 957–58 (footnotes omitted). The *Detroit Automotive* Court further recognized:

The pertinent restriction which requires a licensed broker to be "employed" by a licensed dealer and act as a vehicle salesman for only him, § 15–409(b), can be rationally justified as facilitating the informal supervision of vehicle brokers by licensed dealers. . . . *[T]he one-dealer-one salesman rule conceivably functions to avoid confusion among dealers concerning who will have legal responsibility for supervising the conduct of a salesman on a given transaction.*

*Id.* at 969 n. 9 (emphasis supplied).

These cases demonstrate that the hierarchial structure found in today's automobile industry—from manufacturer to dealer to salesman—is an integral part of Maryland's statutory enforcement mechanism. This mechanism places a premium on the control exercised by one party over another in the process. In our view, § 15–404's "employed

by" requirement should be read in light of this concept. Obviously, dual employment affords a licensed dealer less control over a vehicle salesman than exclusive employment. A qualitative difference exists between the degree of control exercised by the dealer and the degree of control it exercises over UBS referral agents. This qualitative difference reinforces our view that § 15–404 prohibits dual employment. *Cf. United Buying Service v. Dept. of Revenue, supra* (licensure provisions indicate a legislative intent that multiple licensing be permitted).

For these reasons, we hold that the UBS referral agents are not "employed" by licensed dealers to whom they are assigned within the meaning of § 15–404.

### III

UBS contends that the 1972 accommodation constituted an accord and satisfaction that binds the State to grant vehicle salesmen licenses to UBS referral agents under the terms of the May 5, 1972, accommodation letter from MVA to UBS. We disagree.

Although the equitable doctrine of accord and satisfaction ordinarily concerns monetary settlements of debts or liabilities, other settlements not involving an exchange of funds can be as equally binding as an accord and satisfaction. *See Adams v. Wilson,* 264 Md. 1, 12, 284 A.2d 434, 440 (1971) (recognizing that partnership dispute could be resolved by accord and satisfaction). In *Air Power v. Omega Equip. Corp.,* 54 Md.App. 534, 459 A.2d 1120 (1983), the court defined accord and satisfaction as follows:

> Accord and satisfaction is a method of discharging a contract or *cause of action,* whereby the parties agree to give and accept something in settlement of the claim or demand of the one against the other, and perform such agreement, the "accord" being the agreement, and the "satisfaction" its execution or performance.

*Id.* at 538, 459 A.2d at 1123 (quoting 1 C.J.S. *Accord and Satisfaction* § 1) (emphasis supplied); *see Porter v.*

*Berwyn Fuel & Feed Co.*, 244 Md. 629, 224 A.2d 662 (1966). An accord and satisfaction is essentially contractual, consideration for which can take monetary or non-monetary forms. Because the State agreed to issue vehicle salesmen licenses in exchange for UBS's promises to dismiss the law suit and license its referral agents through a licensed dealer, an accord and satisfaction arguably arose. We need not decide, however, whether the accommodation is an accord and satisfaction. Irrespective of whether a state agency was a party to that accommodation or that UBS derived substantial economic benefit therefrom, this Court will not lend its aid to enforce an agreement that directly contravenes state law. *See Patton v. Graves*, 244 Md. 528, 532, 224 A.2d 411 (1966). We therefore expressly hold that the State is not required to grant vehicle salesmen licenses to UBS referral agents under the purported accommodation of May 5, 1972.

JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED AND REMANDED TO THAT COURT FOR AN ENTRY OF A JUDGMENT CONSISTENT WITH THIS OPINION.

COSTS TO BE APPORTIONED EQUALLY BETWEEN THE PARTIES.