488 A.2d 171

**Caroleann Z. WILLIS**

v.

**STATE of Maryland.**

**No. 90, Sept. Term, 1983.**

Court of Appeals of Maryland.

Feb. 22, 1985.

364

John L. Kopolow, Asst. Public Defender, Baltimore (Alan H. Murrell, Public Defender, Baltimore, on brief), for appellant.

Ann E. Singleton, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, on brief), for appellee.

Argued before MURPHY, C.J., ELDRIDGE, COLE, DAVIDSON,* RODOWSKY and COUCH, JJ., and W. ALBERT MENCHINE, Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

COLE, Judge.

When fifteen months old, Caroleann Z. Willis was the sole survivor of an automobile accident that claimed the lives of her parents. Now, over forty years later, Willis is ironically before us in a case where her alleged drunk driving led to the deaths of two persons who unfortunately happened upon an intersection at the moment she ran a red light. A jury convicted Willis of various traffic offenses arising out of this accident and the court sentenced her to a term of imprisonment. She now seeks reversal.

The deceptively straightforward issue of first impression presented in this case, the resolution of which will determine whether the trial court erred in admitting evidence of Willis' blood alcohol test results, is the meaning of the verb "apprehended" as used in Md.Code (1974, 1984 Repl.Vol.), § 10–303, of the Courts and Judicial Proceedings Article (Courts Article).[1]

---

* Davidson, J., participated in the hearing and in the conference of the case in regard to its decision, but died prior to the adoption of the opinion by the Court.

**1.** Unless noted otherwise, all references to the Courts Article shall be to this particular volume.

Pursuant to Md.Rule 828g, the parties submitted an Agreed Statement of Facts. We chronicle such of those facts necessary to place the issue in proper focus. Shortly after 1:00 a.m. on December 25, 1981, Willis was driving a vehicle that ran a red light and collided with an automobile that was traveling through a signal-controlled intersection at U.S. Route 40 and Rogers Avenue in Howard County. Howard County Police Officer James Freeman arrived at the accident scene at 1:10 a.m. and immediately determined the extent of the injuries to the occupants of the respective vehicles. Once Officer Freeman ascertained that the three occupants of the Willis vehicle were not seriously injured, he went to the other vehicle. In that vehicle he found the front seat passenger dead and the driver nearly so, and he attempted to calm the two almost-hysterical passengers in the rear seat. When medical personnel arrived at 1:15 a.m., Officer Freeman directed them to the seriously injured occupants of this vehicle. At 1:18 a.m. Officer Freeman returned to Willis' vehicle to speak with her. The officer testified that Willis had a laceration on her forehead, and that she appeared confused and disoriented. Willis gave Officer Freeman her driver's license, and when he asked where she had been, Willis replied that she had been at "George's" but that she "hadn't had that many drinks." During this conversation, Officer Freeman detected an odor of alcohol from her person.

At 1:32 a.m. Officer Belding of the Traffic Enforcement Section (TES) of the Howard County Police Department arrived.[2] Officer Freeman informed Officer Belding of the

---

2. The record indicates that TES has jurisdiction of all fatal traffic accidents. When TES officers arrive at a fatal automobile accident scene, routine patrol officers such as Officer Freeman are relieved of their primary duties and are assigned to assist TES personnel in the investigation of the fatal accident. In addition, once fire department personnel arrive, they assume jurisdiction over emergency medical care, thus relieving police from any further responsibility in that area. Fire department personnel arrived at 1:15 a.m., and the first ambulance arrived at the accident scene at 1:22 a.m.

former's observations of Willis and gave Officer Belding Willis' driver's license. Eight minutes later, at 1:40 a.m., Sergeant Porter of TES arrived and assumed control over the investigation.

Emergency medical personnel placed Willis in a waiting ambulance at 1:52 a.m. Sergeant Porter directed Officer Cook, a plainclothes police officer who had arrived in an unmarked police cruiser at 1:45 a.m., to follow the ambulance to the hospital and to offer Willis a chemical test for alcohol if he had reasonable grounds to do so.

Willis remained at the scene in the ambulance from 1:52 a.m. to 2:37 a.m., at which time the ambulance departed for the hospital. The record indicates that as a matter of policy in Howard County ambulances and their personnel ordinarily remain at an accident scene until all accident victims are extricated from the vehicles. During the 45 minute period that Willis was in the ambulance at the accident scene, she was periodically attended to by medical personnel. Officer Cook opened the ambulance door at approximately 2:00 a.m. to check on Willis, but he did not speak to her because she was with two medical personnel. Although Willis never attempted to leave the ambulance, Officer Cook indicated that he would have detained her for the purpose of completing his investigation had she attempted to leave.

The ambulance containing Willis departed for the hospital at 2:37 a.m., and arrived at approximately 2:47 a.m. Hospital personnel completed their treatment of Willis at 3:00 a.m. Officer Cook, who was in the emergency room area during Willis' treatment, received permission from the medical staff to speak with Willis at 3:00 a.m. Officer Cook approached Willis, who was then lying on an emergency room table, and noticed that she had a strong odor of alcohol on her breath, that her eyes were bloodshot, that she slurred her speech, and that she appeared confused. When Willis got up to walk to another area, Officer Cook

observed that her balance was unsteady. He then read Willis the *Miranda* warnings and the "DR–15" warnings [3] about the blood-alcohol test. Because of the holiday period, Officer Cook was unable to enlist any hospital personnel to administer the test. Ultimately, he persuaded Willis' treating physician to withdraw a specimen of her blood at 4:50 a.m. The test indicated a blood alcohol concentration of .15 percent. [4]

---

**3.** The DR–15 "warnings," also referred to as the Advice of Rights and Administrative Penalties for Refusal to Submit to a Chemical Test statement, is a standardized statement of a detained driver's rights and the adverse administrative consequences for refusal to submit to a chemical test under the State's implied consent statute, Md.Code (1984 Repl.Vol.), § 16–205.1 of the Transportation Article. For the complete text of the DR–15 warnings, *see Sites v. State*, 300 Md. 702, 707–08 n. 1, 481 A.2d 192, 194–95 n. 1 (1984).

**4.** Set forth below is an abbreviated chronology of the events that transpired during the early morning hours of December 25, 1981.

| TIME (approximate) | EVENT |
|---|---|
| 1:05 a.m. | Accident occurs. |
| 1:10 a.m. | Police first arrive at accident scene. |
| 1:15 a.m. | Medical personnel arrive. |
| 1:18 a.m. | Officer Freeman ascertains that Willis is confused and disoriented and learns that she had been at "George's" and "hadn't had that many drinks." Officer Freeman detects odor of alcohol on her person, and takes Willis' driver's license. |
| 1:32 a.m. | Officer Belding of TES arrives; Officer Freeman gives Willis' driver's license to Officer Belding. |
| 1:40 a.m. | Sergeant Porter of TES arrives and instructs Officer Cook, who arrived a few minutes later, to follow the ambulance containing Willis to the hospital and give her a blood-alcohol test if he has reasonable grounds to do so. |
| 1:52 a.m. | Emergency medical personnel place Willis in ambulance. |
| 2:00 a.m. | Officer Cook looks in on Willis, but he does not speak to her. |
| 2:37 a.m. | Ambulance departs for hospital. |
| 2:47 a.m. | Ambulance arrives at hospital. |
| 3:00 a.m. | Hospital personnel finish treating Willis. Officer Cook advises Willis of her *Miranda* and DR–15 warnings, and Willis consents to take a blood alcohol test. |
| 4:50 a.m. | Qualified medical person administers blood test. |

At a pretrial hearing held in the Circuit Court for Howard County (Honorable Martin A. Wolff, presiding), Willis sought to suppress the blood alcohol test results because the test was not administered "within two hours after the person accused is apprehended" under § 10–303 of the Courts Article. The suppression court disagreed, ruling that Willis was "apprehended" at 3:00 a.m.—less than two hours before the test was administered at 4:50 a.m.—when medical treatment was completed and after Officer Cook advised Willis of her rights.

A jury convicted Willis of two counts of manslaughter by automobile under Md.Code (1957, 1982 Repl.Vol.), Art. 27, § 388, one count of driving while intoxicated under Md.Code (1977, 1981 Cum.Supp.), § 21–902(a) of the Transportation Article, and related traffic offenses. The trial court sentenced Willis to a total of five years' imprisonment, three of which the trial court suspended. The Court of Special Appeals affirmed the convictions and sentences, holding that Willis was "apprehended" within the meaning of § 10–303 of the Courts Article when Officer Cook advised Willis of her rights, and that the trial court properly admitted evidence of the blood alcohol test results. *Willis v. State*, 55 Md.App. 65, 69, 460 A.2d 1043, 1045 (1983). We granted certiorari to consider the important evidentiary question presented.

I

The tragic circumstances of this case are a grim but graphic reminder of the terrible toll exacted by automobile accidents. The carnage caused by drunk drivers on American highways is a national problem that does not require detailed documentation. *See South Dakota v. Neville*, 459 U.S. 553, 558, 103 S.Ct. 916, 920, 74 L.Ed.2d 748, 755 (1983). This case glaringly demonstrates that Maryland enjoys no immunity from this lamentable problem, "[t]he magnitude of [which] ... cannot be exaggerated." *Little v. State*, 300 Md. 485, 504, 479 A.2d 903, 912 (1984). The General Assembly, however, has attempted to meet the considerable chal-

lenge created by this problem by enacting a series of measures to rid our highways of the drunk driver menace. These measures, some of which are decades old, are primarily designed to enhance the ability of prosecutors to deal effectively with the drunk driver problem. *State v. Werkheiser*, 299 Md. 529, 533, 474 A.2d 898, 900 (1984). In this case, the central focus of our inquiry shall be on § 10–303 of the Courts Article, which provides that "[t]he specimen of breath or blood shall be taken within two hours after the person accused is apprehended."

As an initial matter we note that many jurisdictions have enacted implied consent laws that contain an express time limit within which a chemical test for intoxication must be administered. In some jurisdictions, the triggering event is the offense or violation,[5] the arrest of the accused,[6] the driving,[7] the event to be proved,[8] or a combination thereof. In other jurisdictions, the test must be administered within a "reasonable time" after the offense.[9] Maryland, however, is evidently the sole jurisdiction that uses the term "ap-

---

5. *E.g.,* Ark.Stat.Ann. § 75–1031.1(a) (Supp.1983) (two hours); Hawaii Rev.Stat. § 291–5 (Supp.1983) (three hours); Minn.Stat.Ann. § 169.-121(2) (West Supp.1984) (two hours); Ohio Rev.Code Ann. § 4511.-19(B) (Page Supp.1983) (two hours); W.Va.Code § 17C–5–8 (Supp. 1984) (two hours); *see also* Anchorage, Alaska Mun. § 9.28.020 (four hours), *construed in Erickson v. Municipality of Anchorage,* 662 P.2d 963 (Alaska Ct.App.1983).

6. *E.g.,* Ind.Code Ann. § 9–11–4–2 (Burns Supp.1984) (three hours); Iowa Code Ann. § 321B.4.2 (West Supp.1984–1985) (two hours); Okla. Stat.Ann. tit. 47, § 756(e) (West Supp.1984–1985) (two hours); *see also* Tex.Civil Code Ann. § 6701*l*–5(3)(d) (Vernon Supp.1984) (*additional test* must be performed within two hours of arrest); *Presidential Commission on Drunk Driving* 17 (Final Report Nov. 1983) (recommending three hour time limit after arrest).

7. *E.g.,* N.D.Cent.Code § 39–20–03.1 (Supp.1983) (two hours).

8. *E.g.,* Wis.Stat.Ann. § 885–235(1) (West Supp.1984–1985) (three hours).

9. *See, e.g.,* Colo.Rev.Stat. § 42–4–1202(2) (Supp.1983); S.C.Code Ann. § 56–5–2950(a) (Law.Co-op.1976) (as soon as practicable without undue delay).

prehended" as the determinative event that initiates the running of the chemical test clock.[10] Because the General Assembly has not defined "apprehended" as that term is used in § 10–303, our task is to determine its meaning.

Willis argues that an accused is "apprehended" under § 10–303 when a police officer first becomes aware of the accused's inebriated condition and decides to restrain the accused, if necessary, for further investigation. Under this interpretation Willis contends that she was apprehended when Officer Cook formulated the intent to detain her while she was in the ambulance at the accident scene, which was prior to 2:37 a.m. Because the blood test administered at 4:50 p.m. was not within two hours of her apprehension, Willis maintains that the test results are inadmissible under the § 10–309 exclusionary rule. The State of course disagrees with this view. According to the State, Willis was apprehended under § 10–303 when Officer Cook detained her at the hospital at 3:00 a.m. and advised Willis of her rights. Prior to this time Willis was not "apprehended" because she was not under police control or custody. The State therefore reasons that the test was administered within two hours after Willis was apprehended. Based upon our examination of the facts, we believe the State has the sound position.

Section 10–303 simply states that "[t]he specimen of breath or blood shall be taken within two hours after the person accused is apprehended." This section is part of a comprehensive scheme designed to regulate the evidentiary procedures in drunk driving cases. A brief review of §§ 10–303 to –309 will make this statutory scheme clear.

Section 10–302 provides that a chemical test may be administered to a person who is driving or attempting to drive a motor vehicle in violation of § 21–902 of the Transportation Article for the purpose of determining his blood

---

**10.** *Cf.* S.C.Code Ann. § 56–5–2950(a) (Law.Co-op.1976) (using "apprehended" in text of implied consent statute).

alcohol content.[11] Section 10–304 delineates the qualifications for persons authorized to administer either a blood or breath test and allows an accused under certain circumstances to request either test. This statute further requires that the toxicologist under the Postmortem Examiner's Commission approve the chemical test equipment. Section 10–305 indicates that a breath test shall be administered, unless (1) the defendant is unconscious or otherwise incapable of refusing to take a chemical test, (2) the injuries to the defendant necessitate his removal to a medical facility, or (3) equipment for administering the breath test is unavailable. In these three limited circumstances, § 10–303 directs that a blood test be administered. The next statute, § 10–306, indicates that the chemical test results are admissible without the presence or testimony of the technician who administered the test. *See Moon v. State,* 300 Md. 354, 370, 478 A.2d 695, 703 (1984) (*Moon* II) (discussing § 10–306), *cert. denied,* —— U.S. ——, 105 S.Ct. 1170, 83 L.Ed.2d —— (1985). Section 10–307 specifies four presumptions that the chemical test results create: (1) a blood alcohol concentration (BAC) of .05 percent or less raises a presumption that the defendant was not intoxicated or under the influence of alcohol; (2) a BAC of more than .05 percent but less than .08 percent does not give rise to any presumption; (3) a BAC of .08 percent or greater is prima facie evidence that the defendant was driving while under the influence of alcohol; and (4) a BAC of .13 percent or more is prima facie evidence that the defendant was intoxicated. Section 10–

---

**11.** In a 1981 decision, we held that the procedures set forth in §§ 10–302 to –309 of the Courts Article applied to prosecutions for automobile manslaughter (Art. 27, § 388) and homicide by motor vehicle while intoxicated (Art. 27, § 388A). *State v. Loscomb,* 291 Md. 424, 435 A.2d 764 (1981). The General Assembly subsequently enacted legislation that effectively excluded these particular offenses from the procedural requirements of §§ 10–302 to –309 of the Courts Article. *See* 1982 Md.Laws 93. Specifically, the legislature limited the exclusionary rule under § 10–309 to violations of § 21–902 of the Transportation Article. *See infra* note 12. Because this amendment was effective July 1, 1982, it has no application to the instant case, which had its genesis six months earlier on December 25, 1981.

308 states that evidence of chemical test results does not limit the introduction of other evidence concerning the defendant's drunk driving. *See State v. Werkheiser, supra,* 299 Md. at 539–40, 474 A.2d at 904 (chemical analysis is not a prerequisite to a prosecution for drunk driving).

The provisions governing chemical tests for intoxication also include an exclusionary rule under § 10–309. At the time of the offense in this case, this statute provided: [12]

(a) *Test not compulsory.*—A person may not be compelled to submit to a chemical analysis provided for in this subtitle. Evidence of chemical analysis is not admissible if obtained contrary to its provisions. No inference or presumption concerning either guilt or innocence arises because of refusal to submit. The fact of refusal to submit is not admissible in evidence at the trial.

(b) *Consequences of refusal.*—This subsection does not limit the provisions of the vehicle laws regarding the

---

**12.** In evident response to our decision in *State v. Loscomb,* 291 Md. 424, 435 A.2d 764 (1981), the General Assembly extensively revised § 10–309 in 1982. In its present form, the § 10–309 exclusionary rule is apparently limited to violations of § 21–902 of the Transportation Article, and does not apply to violations of Art. 27, § 388 or § 388A. *See supra* note 11. Section 10–309 now provides:

(a) *Test not compulsory.*—Except as provided in § 16–205.1(c) of the Transportation Article, a person may not be compelled to submit to a chemical analysis provided for in this subtitle. Evidence of chemical analysis is not admissible in a prosecution for a violation of § 21–902 of the Transportation Article if obtained contrary to its provisions. No inference or presumption concerning either guilt or innocence arises because of refusal to submit. The fact of refusal to submit is not admissible in evidence at the trial.

(b) *Consequences of refusal.*—This subsection does not limit the provisions of the vehicle laws regarding the consequences of refusal to submit to a chemical test or tests.

(c) *Extent of limits on admissibility of analysis.—Violation of TR* § 21–902.—Nothing in this section precludes or limits the admissibility of evidence of chemical analysis in any prosecution other than for a violation of § 21–902 of the Transportation Article.

(d) *Same—Analysis obtained under TR* § 16–205.1.—Nothing in this section precludes or limits admissibility of evidence of chemical analysis which is obtained as provided in § 16–205.1(c) of the Transportation Article.

consequences of refusal to submit to a chemical test or tests.

Md.Code (1974, 1980 Repl.Vol., 1981 Cum.Supp.), § 10–309 of the Courts Article. Because this provision was in effect prior to the extensive substantive changes enacted by the General Assembly in 1982, *see* 1982 Md.Laws 93, 100, the exclusionary rule under § 10–309 applies to both § 21–902 of the Transportation Article (driving while intoxicated) and Art. 27, § 388 (automobile manslaughter) and § 388A (homicide by motor vehicle while intoxicated). *See State v. Loscomb*, 291 Md. 424, 435 A.2d 764 (1981).

The procedural guidelines outlined above make clear that the statutes were enacted to discourage persons from drinking and driving, to enable law enforcement officers to identify those who drink and drive, and to afford certain rights to drivers who disclaimed that they were driving while drunk. Because this case arose before the 1982 amendment to § 10–309, the determinative issue is the level of impairment of the accused at the time of the offense, be it driving while intoxicated, automobile manslaughter, or homicide by motor vehicle while intoxicated. The legislature created a two-hour time limit in § 10–303 for the purpose of taking a specimen of breath or blood from the person accused after his apprehension. We turn then to the statute to determine when the two-hour clock commences its countdown.

## II

■ As we have stated on innumerable occasions, the cardinal rule of statutory construction is to determine the legislative intent. The starting point, of course, is the language of the statute itself. If that language is clear we need not inquire further. If, however, that language is ambiguous and of doubtful import, we must resort to extrinsic aids to divine the legislative intent and purpose. In so doing, we consider the subject matter of the statute, the purpose underlying its enactment, and the object sought to

be accomplished. *Automobile Trade Ass'n v. Harold Folk Enter.*, 301 Md. 642, 653, 484 A.2d 612, 617 (1984); *Board of Examiners in Optometry v. Spitz,* 300 Md. 466, 474, 479 A.2d 363, 367 (1984); *Ryder Truck Lines v. Kennedy,* 296 Md. 528, 535–36, 463 A.2d 850, 855 (1983).

As an initial matter the Courts Article does not define "apprehended," and the text of § 10–303, standing alone, provides no clue as to its meaning. Given this ambiguity, we resort to other aids to ascertain the legislature's intent.[13]

■ An important extrinsic aid useful in deciding questions of interpretation, and one that we find dispositive of this issue, is the doctrine of *in pari materia.* Under this doctrine the statute in question is construed by reference to other statutes dealing with the same subject. *See* 2A Sutherland, *Statutes and Statutory Construction* §§ 51.01 to .03, at 449–97 (4th ed. C. Sands 1984). As noted above, §§ 10–302 to –309 of the Courts Article and Maryland's implied consent statute, § 16–205.1 of the Transportation Article, both deal with drunk driving. Four years ago we carefully explored the predecessors to and legislative histories of these statutes and concluded that they are *in pari materia* and must be read together and harmonized. *State v. Loscomb, supra,* 291 Md. at 432, 435 A.2d at 768. · The relevant language under the implied consent statute is "stop or detain." In particular, § 16–205.1 states that a person impliedly consents "to take a chemical test to determine the alcohol content of his blood if he should be *detained* on suspicion of driving or attempting to drive while intoxicated or while under the influence of alcohol"

---

**13.** Willis agrees that we must turn to other aids to determine the General Assembly's intent in using "apprehended," although she arrives at this conclusion rather circuitously. Relying upon dictionary meanings and the terms "accused" and "reasonable grounds" as used in § 10–303, Willis initially contended that the ordinary and natural signification of an apprehension is an arrest. She later abandoned this argument. We, therefore, do not address this contention.

(Emphasis supplied). Section 16–205.1(c) [14] further provides:

> If a police officer *stops or detains any individual who the police officer has reasonable grounds to believe* is or has been driving while intoxicated or while under the influence of alcohol, the police officer shall:
>
> (i) *Detain* the individual;
>
> (ii) Request that the individual permit a chemical test to be taken of his blood or breath to determine the alcoholic content of his blood; [and]
>
> (iii) Advise the individual of the administrative penalties that shall be imposed for refusal to take the test[.] [Emphasis supplied].

This language, coupled with the *Loscomb* requirement that we construe § 10–303 of the Courts Article and § 16–205.1 of the Transportation Article *in pari materia,* convinces us that the General Assembly intended for an apprehension to be the functional equivalent of a stop or detention. Harmonizing these statutory provisions in this manner avoids needless conflict between statutes having the same object: the identification and removal of drunk drivers from Maryland's highways. We therefore agree with the Court of Special Appeals that this construction comports with the teachings of *Loscomb* and represents a reasonable construction of the relevant statute.

■ Based on the foregoing, we hold that an accused is "apprehended" when a police officer has reasonable grounds to believe that the person is or has been driving a motor vehicle while intoxicated or while under the influence of alcohol and the police officer reasonably acts upon that information by stopping or detaining the person. In our view, this objective-based standard precludes the probability

---

14. Although this particular section was in effect at the time of this case, Md.Code (1977, 1981 Cum.Supp.), § 16–205.1(c) of the Transportation Article, the General Assembly amended the language in 1982 and reenacted it as § 16–205.1(b)(2) of the Transportation Article.

that an officer may manipulate the two-hour clock under § 10–303 of the Courts Article.[15]

In the ordinary drunk driving case it is not difficult to ascertain at what point the person accused is apprehended. For example, a skilled police officer will observe typical indicia of drunk driving, such as speeding, weaving, disobeying traffic signals, and other erratic or unusual maneuvers. Upon observing these indicia a police officer will stop the motorist. If the police officer suspects that the driver may be driving or attempting to drive a motor vehicle in violation of § 21–902 of the Transportation Article, the officer may request the driver to perform various field sobriety tests.[16] If the driver performs these tests poorly, the officer has certain options available.

First, the officer may, without making a formal arrest and prior to the issuance of a citation, request that the person submit to a preliminary breath test in accordance with § 16–205.1 of the Transportation Article.

Second, the officer may stop or detain the person and request that he submit to a chemical test for intoxication

---

**15.** Willis argues that an apprehension occurs at the moment the officer first decides that he would, if necessary, restrain a drunk driver. In our view, the subjective intent of the officer, standing alone, is not controlling; it is when he acts upon that intent that an apprehension occurs.

Willis further contends that she was apprehended when Officer Freeman took her driver's license at the accident scene. We disagree. As an initial matter, the production of a driver's license is an essentially neutral act. *Byrd v. State,* 13 Md.App. 288, 293, 283 A.2d 9, 11 (1971). Moreover, Maryland law requires that a driver of a vehicle that is involved in an accident that results in bodily injury to or death of any person shall, among other duties, exhibit his license to drive to any police officer, upon request, who is at the scene of or otherwise investigating the accident. Md.Code (1984 Repl.Vol.), § 20–104(a)(3) of the Transportation Article.

**16.** Field sobriety tests are simple coordination tests, such as walking a straight line, touching the fingers to the nose, standing on one foot, and reciting the alphabet. *Little v. State, supra,* 300 Md. at 491 n. 2, 479 A.2d at 906 n. 2; *see* Craddick, *Blood-Alcohol Tests:* Neville *and its Progeny,* 20 Crim.L.Bull. 493, 501 n. 30 (1984) (elaborating upon various types of field sobriety tests).

under the procedures detailed in § 16–205.1(b).[17]   In these circumstances the person accused is apprehended within the meaning of § 10–303.

■ Accidents involving personal injury, however, inject an element of complexity into an otherwise simple determination of when an accused is apprehended.   In this situation a police officer is confronted with the thorny dilemma of gathering evidence from a drunk driving suspect who may also be suffering from untreated medical injuries.   *People v. Wade*, 118 Misc.2d 330, 460 N.Y.S.2d 870 (1983).   This dilemma, upon closer examination, is more apparent than real.

At the most basic level a police officer cannot be considered to have "stopped" the person in the first instance when the person is involved in a motor vehicle accident: the collision, not the police, stopped the person.   Under a more refined and searching inquiry the issue narrows as to what point a police officer is considered to have "apprehended" the accused at an automobile accident scene.   Of course, common sense dictates that upon arriving at an accident scene the officer's paramount responsibility is to render any necessary emergency medical treatment until trained personnel arrive.   Until such a time it would be eminently unreasonable for the officer to engage in a comprehensive accident investigation.   In short, the police officer's investigatory responsibilities are subordinated to the more pressing responsibility of rendering emergency medical treatment and to take other steps to secure the safety of both the victims and the public, such as directing traffic at the accident scene.   Once the appropriate personnel arrive, the

---

**17.**   *Cf.* § 16–205.1(c) (1984 Repl.Vol.) (person involved in fatal automobile accident who is detained by a police officer who has reasonable grounds to believe that the person has been driving or attempting to drive while intoxicated or while under the influence of alcohol shall be required to submit to a chemical test).   At the time of the accident in this case, present § 16–205.1(c) had not yet been enacted.   The General Assembly enacted this particular subsection in 1982.   *See* 1982 Md.Laws 100 (effective July 1, 1982).

officer is in most cases relieved of his emergency medical treatment responsibility and is thus free to engage in an investigation if it does not interfere with the treatment of the injured or jeopardize the safety or welfare of those involved. Hence, police must usually wait until the emergency subsides and until the necessary medical treatment has been rendered before pursuing their criminal investigation. In our view, this objective-based analysis is fully consistent with the legislative intent to preserve the two-hour time limit as an effective requirement and avoids forcing police to choose between ensuring the safety of the accident victims and the prosecution of the accused.

Applying these standards to the instant case convinces us that Officer Cook apprehended Willis at the hospital at 3:00 a.m. Upon arriving at the accident scene Officer Freeman first ascertained the extent and severity of the injuries of the seven accident victims. Officer Freeman then spoke briefly with Willis to find out what caused the accident. At this point Willis stated that she had been to "George's," and that she "hadn't had that many drinks." Officer Freeman, in addition, detected an odor of alcohol from her person. At the suppression hearing Officer Freeman testified that he did not apprehend Willis at that time because he did not have reasonable grounds to believe that she had been driving or attempting to drive while intoxicated or while under the influence of alcohol.

Willis was removed from the vehicle and escorted to a waiting ambulance by the driver of the ambulance (Huff) and his assistant (Sheffield). Huff and Sheffield, together with a firefighter, periodically attended to Willis as she sat in the ambulance. At approximately 2:00 a.m. Officer Cook looked in on Willis but did not speak to her because she was being attended to by Huff and Sheffield. In accordance with his supervisor's directive, Officer Cook followed the ambulance to the hospital. After she had received the necessary medical treatment, Officer Cook received the permission of the attending physician to speak with Willis, who was at the time lying on a gurney in the hospital's

emergency room. Officer Cook spoke with Willis and in the process observed that she had a strong odor of alcohol on her breath, that her eyes were bloodshot, and that her speech was slurred. Based on these observations, and his knowledge that Willis was the driver of the vehicle, Officer Cook had reasonable grounds to believe that Willis had been driving or attempting to drive a motor vehicle while intoxicated or while under the influence of alcohol. It was at this point that Officer Cook had the first opportunity of any police officer involved in this investigation to act upon this information and to apprehend Willis. In our view, Officer Cook acted reasonably by waiting until all necessary emergency medical treatment had been rendered at the hospital. Officer Cook thereupon read Willis her *Miranda* and DR–15 warnings, and she consented to take a blood test. As a result, the test was timely administered.

■ Willis nonetheless contends that a blood alcohol test administered approximately four hours after the accident is unreliable and for that reason is prejudicial. As the Supreme Court and this Court have observed, it is generally agreed that a person's blood alcohol content decreases with the passage of time. *See Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *State v. Moon, supra.* Because any delay in the administration of a chemical test ordinarily inures to the benefit of the accused, an accused suffers no prejudice. We thus find no merit in Willis' contention.

We therefore hold that Willis was apprehended by Officer Cook at the hospital at 3:00 a.m. and that the trial court properly admitted evidence of the results derived from a chemical test for intoxication that was administered to her at 4:50 a.m. Accordingly, we affirm the judgment of the Court of Special Appeals.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. APPELLANT TO PAY THE COSTS.