666 A.2d 128

STATE of Maryland

v.

Ernest JONES, Jr.

No. 42, Sept. Term, 1995.

Court of Appeals of Maryland.

Oct. 16, 1995.

Mary Ellen Barbera, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on brief), Baltimore, for Petitioner.

Leonard R. Stamm (Goldstein & Stamm, P.A., on brief), Greenbelt, for Respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

MURPHY, Chief Judge.

In this appeal, we must determine whether administrative suspension of a driver's license under Maryland Code (1977, 1992 Repl.Vol., 1994 Cum.Supp.) § 16–205.1 of the Transportation Article constitutes "punishment" within the ambit of the United States Constitution's Double Jeopardy Clause or Maryland common law, thereby precluding the State from bringing a subsequent prosecution for the crime of driving while intoxicated. We hold that a temporary suspension of a driver's license under § 16–205.1 does not constitute "punishment" under the law of double jeopardy.

## I

### A

Section 16–205.1 of the Transportation Article provides for the temporary suspension of a driver's license if a driver who is under reasonable suspicion of driving while intoxicated or under the influence of alcohol either (a) refuses to take a breath or blood test to determine the alcohol concentration of his or her blood or (b) takes a test and has a blood alcohol concentration ("BAC") of 0.10 or more. § 16–205.1(a), (b). If the driver refuses to take a test, his or her driver's license is

suspended for 120 days for a first offense and one year for a subsequent offense. § 16–201.1(b)(1)(i)(2). If the driver takes the test and has a BAC above 0.10, his or her driver's license is suspended for 45 days for a first offense or 90 days for a subsequent offense. § 16–205.1(b)(1)(i)(1). The driver may request an administrative hearing. § 16–205.1(f). At this hearing, an administrative law judge (ALJ) may modify the suspension or issue a restricted license if the driver did not refuse to take a test, has not had a license suspended under § 16–205.1 in the past five years, has not been convicted of driving while intoxicated in the past five years, and is required to drive in order to work or to attend an alcohol treatment program. § 16–205.1(n).

## B

On April 25, 1994, Ernest Jones, Jr. was arrested on the charge of driving while intoxicated. A breath test taken shortly after his arrest and with his consent determined that his BAC was 0.27. On August 31, 1994, an ALJ suspended Jones's license for 30 days pursuant to § 16–205.1. The ALJ modified the maximum 45 day suspension after finding that Jones needed to drive for purposes of alcohol education and employment and because Jones had no prior convictions for driving while intoxicated. After considering that Jones previously had received probation before judgement twice for driving while intoxicated, the ALJ declined to issue Jones a permit restricted to work and alcohol education purposes and imposed a straight 30–day suspension.

In a trial before the District Court sitting in Montgomery County on November 15, 1994, Jones was found guilty of driving while intoxicated. Jones appealed to the Circuit Court for Montgomery County, where he filed a motion to dismiss the prosecution contending that to prosecute him for driving while intoxicated after his driver's license had already been suspended for the same reason constituted double jeopardy. The circuit court (McKenna, J.) agreed and dismissed the prosecution against Jones. The State contends before us that the administrative suspension of Jones's license to drive does

not bar a subsequent prosecution of Jones for driving while intoxicated.

## II

## A

The Fifth Amendment to the United States Constitution provides, in part, "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb." Its protection against double jeopardy applies to the states via the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 794–96, 89 S.Ct. 2056, 2062–64, 23 L.Ed.2d 707 (1969). Specifically, it "protects against three distinct abuses: a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and multiple punishments for the same offense." *United States v. Halper*, 490 U.S. 435, 440, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487 (1989). Since neither party contends that the administrative suspension of Jones's license constituted a "prosecution," the imposition of criminal sanctions against Jones for driving while intoxicated violates the Double Jeopardy Clause only if it constitutes a second punishment. Of course, to be subjected to a second punishment requires the imposition of a first punishment. Therefore, prosecuting Jones for driving while intoxicated only puts him in jeopardy a second time if the suspension of Jones's license under § 16–205.1 constituted a "punishment" within the meaning of the Double Jeopardy Clause.

Under our prior cases, § 16–205.1 was not understood as imposing "punishment." In those decisions, we focused on whether the proceeding was criminal or civil in nature. If civil in nature, the proceedings would not have implicated the Double Jeopardy Clause. *Attorney Griev. Comm'n v. Andresen*, 281 Md. 152, 155, 379 A.2d 159 (1965) ("In order for the double jeopardy provisions of the Fifth Amendment ... to be applicable, it would be necessary for this to be a criminal proceeding."); *see In re John P.*, 311 Md. 700, 537 A.2d 263 (1988) (finding that proceedings resulting in loss of visitation

rights or custody of child were civil in nature and were not double jeopardy); *Attorney Griev. Comm'n v. Brown*, 308 Md. 219, 223, 517 A.2d 1111 (1986) (holding that lawyer's double jeopardy claim was "inapposite, because lawyer discipline proceedings are not criminal proceedings"). Under this mode of analysis, § 16–205.1 would not constitute a "punishment" within the meaning of the Double Jeopardy Clause.

Since 1989, however, the Supreme Court has revised its test for determining when "punishment" is inflicted under the Double Jeopardy Clause. In the court below and in his brief to this Court, Jones argues that three recent Supreme Court decisions mandate the circuit court's finding that § 16–205.1 imposes "punishment." These cases are *United States v. Halper*, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), *Austin v. United States*, —— U.S. ——, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993), and *Department of Revenue of Montana v. Kurth Ranch*, —— U.S. ——, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994). This appeal presents the first occasion where we directly address a Fifth Amendment double jeopardy challenge to a civil sanction since the Supreme Court decided *Kurth Ranch*. For this reason, and because both parties raise different contentions as to the mode of analysis used by the Supreme Court in these three cases, it is necessary to examine each of the cases in some detail.

In *Halper*, the Supreme Court held that a civil penalty imposed upon Halper as a result of his violation of the False Claims Act, 31 U.S.C. §§ 3729–3731, constituted "punishment" to the extent that the penalty exceeded the government's loss and actual costs in enforcing the act. *Halper, supra*, 490 U.S. at 447–52, 109 S.Ct. at 1901–04. Halper was convicted of 65 separate violations of the criminal false claims statute, 18 U.S.C. § 287, each involving a demand for $12 in reimbursement for medical services worth only $3. *Id.* at 437, 109 S.Ct. at 1895–96. After Halper was incarcerated and fined under the criminal statute, the government sought to hold Halper additionally liable for a $2,000 civil penalty for each of the 65 violations. *Id.* at 438, 109 S.Ct. at 1896. In contrast to this $130,000 penalty, the government's direct loss was $585, and

its expenses in prosecuting and investigating Halper were estimated by the trial court at $16,000. *Id.* at 437, 452, 109 S.Ct. at 1895–96, 1903–04.

The government first argued that the Double Jeopardy Clause did not apply because the proceedings were civil in nature. *Id.* at 446–47, 109 S.Ct. at 1900–01. The Court found that "the labels 'criminal' and 'civil' are not of paramount importance," and "the determination whether a given civil sanction constitutes punishment in the relevant sense requires a particularized assessment of the penalty imposed and the purposes that the penalty may fairly be said to serve." *Id.* at 448, 109 S.Ct. at 1901.

The Court next dealt with the contention that the civil liability imposed on Halper was not punishment because its purpose was to provide a remedy for the government's costs of investigating and prosecuting false claims. *Id.* at 448–49, 109 S.Ct. at 1901–02. Noting that "punishment serves the twin aims of retribution and deterrence," *Id.* at 448, 109 S.Ct. at 1901, the Court stated that " '[r]etribution and deterrence are not legitimate nonpunitive governmental objectives.' " *Id.* (quoting *Bell v. Wolfish,* 441 U.S. 520, 539 n. 20, 99 S.Ct. 1861, 1874 n. 20, 60 L.Ed.2d 447 (1979)). Therefore, "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment." *Id.* The Court relied upon the " 'tremendous disparity' between the Government's actual damages and the civil penalty authorized by the Act" in holding that the $130,000 liability could not be fairly seen as solely remedial. *Id.* at 452, 109 S.Ct. at 1903–04.

The rule in *Halper,* however, does not require an exact balancing of a law's remedial purpose. *Id.* at 449, 109 S.Ct. at 1902 ("We acknowledge that this inquiry will not be an exact pursuit."). The Court noted that "the process of affixing a sanction that compensates the Government for all its costs inevitably involves an element of rough justice." *Id.* The focus is upon whether the statute may be "fairly" said to be

remedial, *id.* at 448, 109 S.Ct. at 1901–02, or whether the civil penalty bears a "rational relation" to the government's remedial goal. *Id.* at 449, 109 S.Ct. at 1902. Therefore, *Halper* announced "a rule for the rare case," and stated that "[t]he rule is one of reason." *Id.* Although *Halper* specifically addressed the remedial and punitive nature of civil fines, its actual holding was phrased in more general terms:

> We therefore hold that under the Double Jeopardy Clause a defendant who already has been punished in a criminal prosecution may not be subjected to an additional civil sanction to the extent that the second sanction may not fairly be characterized as remedial, but only as a deterrent or retribution.

*Id.* at 448–49, 109 S.Ct. at 1902.

In *Austin,* the Supreme Court held that the Eighth Amendment's Excessive Fines Clause should be applied to *in rem* civil forfeiture proceedings. *Austin, supra,* —— U.S. at ——, 113 S.Ct. at 2812. The Court determined that such procedures must comport with the requirements of the Eighth Amendment because they impose "punishment." *Id.* In making this finding, the Supreme Court used *Halper's* definition of "punishment" under the Double Jeopardy Clause to define "punishment" for purposes of the Eighth Amendment. *Id.* at ——, —— – ——, 113 S.Ct. at 2806, 2811–12. The Court stated that "[w]e need not exclude the possibility that a forfeiture serves remedial purposes to conclude that it is subject to the limitations of the Excessive Fines Clause. We, however, must determine that [the forfeiture] can only be explained as serving in part to punish." *Id.* at ——, 113 S.Ct. at 2806.

In determining the purposes served by civil forfeitures, the Court first looked at the historical uses of forfeitures, finding that "forfeiture generally and statutory *in rem* forfeiture in particular historically have been understood, at least in part, as punishment." *Id.* at ——, 113 S.Ct. at 2810. The Court then turned to the specific forfeiture provisions at issue, and found "nothing in these provisions or their legislative history

to contradict the historical understanding of forfeiture as punishment." *Id.*

In examining the provisions at issue, the Court specifically noted provisions in the forfeiture statute focusing on the culpability of the property owner, such as an "innocent owner" defense and tying the forfeiture directly to the commission of a drug offense. *Id.* at ——, 113 S.Ct. at 2810–11. The Court also used the legislative history to demonstrate that the civil forfeiture provisions were punitive in nature, and that Congress had passed them after finding that traditional sanctions were inadequate. *Id.* Finally, the Court rejected the government's argument that the sanctions were remedial, finding that the forfeited property was not itself dangerous and that there was no connection between the amount recovered via civil forfeiture and the government's costs in enforcing the drug laws. *Id.* at ——, 113 S.Ct. at 2811–12.

In finding that the civil forfeiture law constituted "punishment" the Court re-stated *Halper's* holding that " '[a] civil sanction that cannot fairly be said *solely* to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term.' " *Id.* at ——, 113 S.Ct. at 2812 (quoting *Halper, supra,* 490 U.S. at 448, 109 S.Ct. at 1901–02) (emphasis in *Austin* ). Thus, "[i]n light of the historical understanding of forfeiture as punishment, the clear focus of §§ 881(a)(4) and (a)(7) on the culpability of the owner, and the evidence that Congress understood these provisions as serving to deter and to punish, we cannot conclude that forfeiture under [these provisions] serves solely a remedial purpose." *Id.*

In *Kurth Ranch,* the Court held that a "tax" on illegal drugs imposed after those drugs were seized by law enforcement and taxing the drugs at more than eight times their market value imposed "punishment" under the Double Jeopardy Clause. *Kurth Ranch, supra,* —— U.S. at ——, 114 S.Ct. at 1948. In that case, six members of the Kurth family were arrested and convicted for cultivating marijuana on the family

farm. *Id.* at ——, 114 S.Ct. at 1942. The family also settled a civil forfeiture action with the county attorney, agreeing to forfeit $18,016.93 in cash and equipment. *Id.* In a third proceeding, the Montana Department of Revenue sought to collect almost $900,000 in taxes on the confiscated marijuana, hash tar, and hash oil. *Id.* at ——, 114 S.Ct. at 1942–43. The Kurths filed a petition for bankruptcy, and the Bankruptcy Court determined that Montana's Dangerous Drug Tax Act authorized an assessment of $181,000 against the Kurths, but that this assessment constituted double jeopardy. *Id.* at ——, 114 S.Ct. at 1943.

The Supreme Court agreed that the drug tax was a second "punishment" that was forbidden by the Double Jeopardy Clause. In finding that the tax was imposed as punishment, the Court noted that "while a high tax rate and deterrent purpose lend support to the characterization of the drug tax as punishment, these features, in and of themselves, do not necessarily render the tax punitive." *Id.* at ——, 114 S.Ct. at 1947. The Court rested its holding on two main conditions. First, the Court noted that "this so-called tax is conditioned on the commission of a crime. That condition is 'significant of penal and prohibitory intent rather than the gathering of revenue.'" *Id.* (quoting *United States v. Constantine*, 296 U.S. 287, 295, 56 S.Ct. 223, 227, 80 L.Ed. 233 (1935)). Second, although the tax "purports to be a species of property tax . . . it is levied on goods that the taxpayer neither owns nor possesses when the tax is imposed." *Id.* at ——, 114 S.Ct. at 1948. Based upon these factors, the Court found that "[t]aken as a whole, this drug tax is a concoction of anomalies, too far-removed in crucial respects from a standard tax assessment to escape characterization as punishment for the purpose of Double Jeopardy analysis." *Id.*

The Court declined to find that the tax statute had a remedial purpose because "tax statutes serve a purpose quite different from civil penalties, and *Halper*'s method of deter-mining whether the exaction was remedial or punitive 'simply does not work in the case of a tax statute.'" *Id.* (quoting *Kurth Ranch, supra,* —— U.S. at ——, 114 S.Ct. at 1950

(Rehnquist, C.J., dissenting)). In addition, Montana presented no claim that its assessment "even remotely approximates the cost of investigating, apprehending, and prosecuting the Kurths, or that it roughly relates to any actual damages that they caused the State." *Id.*

## B

The State and Jones raise conflicting contentions as to the proper application of *Halper, Austin,* and *Kurth Ranch.* The State argues that *Halper* provides the relevant test, that *Austin,* as an Eighth Amendment decision, is inapplicable to the instant case, and that *Kurth Ranch* is a narrow decision that is limited to tax cases. Consequently, the State argues that *Halper* applies, and § 16–205.1 is only "punishment" if the defendant can demonstrate that it was imposed solely for punishment.

Relying heavily on the opinions of those *dissenting* in *Kurth Ranch,* Jones argues that *Kurth Ranch* has dramatically expanded the reach of the double jeopardy clause. He also argues that *Kurth Ranch* applies here because the suspension is conditioned on the commission of a crime, because the legislature had punishment in mind when it passed the statute, and because the license suspension cannot be neatly divided between its possible punitive and remedial goals. Finally, Jones argues that § 16–205.1 does not further the remedial goal of removing unsafe drivers from the road. As a result, Jones argues that the suspension of his license cannot be justified solely as remedial, and that it can only be described as "punishment."

In our opinion, neither party's contentions are entirely correct. *Halper, Austin,* and *Kurth Ranch* are all relevant authority for the determination we must make. We note, however, that *Halper* and *Kurth Ranch,* the two decisions dealing with the Double Jeopardy Clause, dealt with governmental overreaching on a scale which is simply not present in this case. The 30–day driver's license suspension to which Jones was subjected is in no way as severe as the $130,000

fine at issue in *Halper* or the drug "tax" imposed on illegal goods at eight times their "market" value at issue in *Kurth Ranch*. *Halper, supra,* 490 U.S. at 438, 109 S.Ct. at 1896; *Kurth Ranch, supra,* —— U.S. at ——, 114 S.Ct. at 1942–43. Whatever its ills, § 16–205.1 obviously does not present an abuse of governmental authority of the magnitude presented in *Halper* or *Kurth Ranch*.

Although the severity of the sanction imposed by § 16–205.1 is one element in the balance that we must ultimately draw, the Supreme Court's "punishment" analysis goes be-·yond the severity of the imposed sanction. While *Halper, Austin,* and *Kurth Ranch* do not provide a tidy formulaic approach through which a result may be obtained by simply plugging in relevant facts, they provide the means by which we must analyze the issue before us. Our analysis begins as mandated in *Halper*: "the determination whether a given civil sanction constitutes punishment in the relevant sense requires a particularized assessment of the penalty imposed and the purposes that the penalty may fairly be said to serve." *Halper, supra,* 490 U.S. at 448, 109 S.Ct. at 1901–02. *Halper* conducted this particularized assessment for civil fines, *Austin* conducted such an assessment for civil *in rem* forfeitures, and *Kurth Ranch* conducted such an assessment for a "drug tax." Here, we must conduct a particularized assessment of the purposes served by a law suspending a driver's license when tests show that he had been driving with a BAC exceeding a statutory maximum.

As an initial matter, the Supreme Court has made it clear that whether a sanction constitutes punishment is not to be determined from the defendant's perspective. *Halper, supra,* 490 U.S. at 447 n. 7, 109 S.Ct. at 1901 n. 7. "On the contrary, . . . for the defendant even remedial sanctions carry the sting of punishment." *Id.* In finding that the administrative license suspension was punishment, the circuit court below mentioned several times the extent to which a defendant's livelihood may depend upon driving or the importance of a driver's license to a defendant. While this may be true,

and while a defendant surely feels the "sting of punishment" upon the suspension of his or her license, we are here concerned with inquiring whether the statute serves the purposes of "punishment" within the specialized meaning of the Fifth Amendment. And for those purposes, the defendant's personal viewpoint is not at issue.

 The central question before us is whether this application of § 16–205.1 can "fairly" be said only to serve a non-punitive purpose. *See Kurth Ranch, supra,* —— U.S. at ——, 114 S.Ct. at 1945, 1948; *Austin, supra,* —— U.S. at ——, 113 S.Ct. at 2812; *Halper, supra,* 490 U.S. at 448, 109 S.Ct. at 1901–02. After examining the Supreme Court's analysis in *Halper, Austin,* and *Kurth Ranch,* we believe our own analysis appropriately proceeds along three axes. First, the statute at issue must be placed within historical context. We must examine prior uses of license suspension to determine whether they have been generally understood as punitive or non-punitive. Second, with this historical understanding in mind, we must turn to § 16–205.1 itself, and examine its language, structure, and, to some degree, the legislature's intent. As a result of this examination, we must determine whether § 16–205.1 evidences a purpose different from the historical understanding given to similar statutes. Finally, if § 16–205.1 serves both punitive and non-punitive purposes, we must determine whether the non-punitive purposes alone fairly justify the sanction imposed in this case.

### 1

We turn first to the common understanding of license revocations and the purposes that they serve. *Austin* and *Kurth Ranch* demonstrate the two different ways in which this historical analysis may frame our examination of the purposes served by § 16–205.1. In *Austin,* the Supreme Court reviewed *in rem* forfeitures under both English and American common law since the 18th Century to determine that forfeitures have historically been recognized as punishment. *Austin, supra,* —— U.S. at ——, 113 S.Ct. at 2806–10. Then, finding "nothing in these provisions or their legislative

history to contradict the historical understanding of forfeiture as punishment," the Court concluded that the provisions at issue could only be explained as serving, at least in part, a punitive purpose. *Id.* at ——, ——, 113 S.Ct. at 2810, 2813.

In *Kurth Ranch,* the Court approached the same question from the opposite direction. The Court first noted that taxes are typically designed to raise revenue rather than to serve punitive goals: "Whereas fines, penalties, and forfeitures are readily characterized as sanctions, taxes are typically different because they are usually motivated by revenue-raising rather than punitive purposes." *Kurth Ranch, supra,* —— U.S. at ——, 114 S.Ct. at 1946. The Court then proceeded to delineate the differences between the "drug tax" and typical, non-punitive taxes, and concluded that "[t]aken as a whole, this drug tax is a concoction of anomalies, too far-removed in crucial respects from a standard tax assessment to escape characterization as punishment for the purpose of Double Jeopardy analysis." *Id.* at ——, 114 S.Ct. at 1948. Taken together, *Austin* and *Kurth Ranch* demonstrate that § 16–205.1 should be presumed to serve the purposes generally served by license suspensions unless the section is different from other license suspensions in some way that negates this presumption.[1]

We find that license suspensions generally serve remedial purposes. This conclusion is drawn from the purposes served by licensing systems themselves, *i.e.* to protect the public from unscrupulous or unskilled operators who would otherwise engage in the licensed activity. For example, Maryland requires a license before practicing any one of a wide range of professions in which there is potential to cause injury to consumers through negligence or malfeasance. *See, e.g.,*

---

1. In *Halper,* the Court did not directly address the historical or general purposes served by civil fines. The Court, however, did review prior cases that found that civil fines serve remedial purposes. *See Halper, supra,* 490 U.S. at 442–46, 109 S.Ct. at 1897–1901 (reviewing, in particular, *Helvering v. Mitchell,* 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917 (1938) and *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943)).

Md.Code (1989, 1995 Repl.) §§ 2–301, 3–302, 4–301, 5–301, 6–301, 7–301, 9–301, 10–206, 11–401, 12–301, 13–301, 14–301, 15–301, 16–301, 17–301 of the Business Occupations & Professions Article. Similarly, a license or certificate of inspection must be procured before operating certain types of businesses. *See, e.g.,* Md.Code (1992, 1994 Supp.) §§ 3–401, 7–301, 9–301, 12–201 of the Business Regulation Article (requiring inspection certificate or license to operate amusement attraction, collection agency, employment agency, or pawn shop).

To ensure a licensee's capability, a licensee must typically meet certain standards before obtaining a license, such as achieving a certain level of education or passing an examination. *See, e.g.,* § 3–303 of the Business Occupations & Professions Article (requiring both education and examination before obtaining an architect's license). To ensure that the public is protected, licensing systems also typically require licensees to meet certain standards of conduct, and a license may typically be suspended or revoked when a licensee acts improperly. *See, e.g.,* § 4–314(a) of the Business Occupations & Professions Article (providing for denial of license to barber, reprimand of licensee, or suspension or revocation of license to barber if licensee uses license fraudulently, is incompetent, is habitually intoxicated, or fails to meet sanitary standards).

From the licensee's perspective, it is certainly true that suspension or revocation of a license may feel like "punishment." A licensing system's ultimate goal, however, is to prevent unscrupulous or incompetent persons from engaging in the licensed activity. To this end, revocation or suspension of a license clearly prevents a wrongdoer from further engaging in the licensed activity, at least temporarily.[2]

---

2. The revocation of a license may seem more obviously remedial than a license suspension, since, once a license is revoked, the unscrupulous operator is banned from the licensed activity indefinitely. A license suspension, on the other hand, only prevents the operator from engaging in the activity for a limited period of time. We do not believe, however, that the Constitution requires the legislature to impose the most severe sanction (and hence require the licensee to feel the sharp-

Both our own cases and those from other courts support this conclusion. For example, we have consistently found that disbarment proceedings against an attorney guilty of misconduct are not conducted to punish the attorney but to protect the public from attorneys who are not fit to practice. *See Maryland St. Bar Ass'n v. Sugarman*, 273 Md. 306, 313–18, 329 A.2d 1 (1974), *cert. denied*, 420 U.S. 974, 95 S.Ct. 1397, 43 L.Ed.2d 654 (1975) (tracing history of this rule back to Lord Mansfield of the House of Lords); *Maryland State Bar Ass'n v. Frank*, 272 Md. 528, 535, 325 A.2d 718 (1974) (agreeing that, in disbarment proceedings against attorney, " 'the primary purpose is not to punish an offender; it is protect the public against members of the bar who are unworthy of the trust and confidence essential to the relationship of the attorney and client' ") (quoting *In re Pennica*, 36 N.J. 401, 177 A.2d 721, 730 (1962)).

Disciplinary proceedings for other professional licensees have been viewed in the same way. *See, e.g., Loui v. Board of Medical Examiners*, 78 Hawai'i 21, 889 P.2d 705, 709–13 (1995) (finding that one-year revocation of license to practice medicine was designed to protect public from unfit physicians and was not punishment under Double Jeopardy Clause); *Schillerstrom v. State*, 180 Ariz. 468, 885 P.2d 156, 158–59 (Ariz.App.1994) (finding that revocation of license to practice as chiropractor was not "punishment" because purpose of revocation was to protect public and maintain standards in profession).

In addition, we have concluded that suspension of a driver's license in at least one circumstance serves remedial goals, although the Double Jeopardy Clause was not at issue in that case. In *Rentals Unlimited v. Administrator*, 286 Md. 104, 405 A.2d 744 (1979), we found that a statute allowing the MVA to suspend the license and registration of any person against whom a foreign judgement has been rendered served

---

est "sting of punishment") before the legislature's actions can be justified as remedial in nature.

the remedial purpose of protecting the public from the reckless operation of vehicles by financially irresponsible drivers by assuring that operators and owners of vehicles against whom judgements might be entered on account of negligent driving, are financially able to pay damages.... To accomplish that purpose fully, the MVA must be authorized to suspend the license and registration of any financially irresponsible vehicle owner or driver....

*Id.* at 110, 405 A.2d 744. Other courts have similarly treated the suspension of a driver's license as a remedial measure. *See, e.g., Butler v. Dept. of Public Safety & Corr.,* 609 So.2d 790, 796 (La.1992) (concluding that "a driver's license suspension is a remedial measure which attempts to protect society from the hazards posed by drunk drivers by removing the driving privileges of those who have been convicted of driving while intoxicated"). In general, therefore, we find that procedures through which licenses are suspended or revoked have a remedial purpose: that of preventing, at least temporarily, a wrongdoer from engaging in an activity when there is reason to believe that they may perform the activity unsafely.

### 2

We next examine § 16–205.1 itself, to determine whether an administrative license suspension under this section demonstrates a purpose different from that served by license suspension proceedings in general. Jones raises four arguments based on the structure and legislative history of § 16–205.1 as to why this statute should be found to serve punitive purposes. First, Jones notes that the license suspension is conditioned upon the commission of a crime. Second, Jones notes that the statute provides no basis for concluding in every case that the driver is presently unsafe or that recidivism is likely. Third, Jones argues that the legislature intended § 16–205.1 to have a punitive effect when the section was passed. Finally, Jones argues that the maximum penalties imposed by § 16–205.1 are so high that the section must have a punitive purpose.

■ We find nothing in the language and structure of the statute itself to show that § 16–205.1 serves a purpose differ-

ent from any other license suspension. The fact that the sanction imposed by § 16–205.1 is conditioned upon committing acts which also constitute a crime does not provide evidence that it serves a punitive purpose. In *Kurth Ranch*, the fact that "this so-called tax is conditioned on the commission of a crime" was significant in finding that the drug tax only served punitive goals. *Kurth Ranch, supra,* —— U.S. at ——, 114 S.Ct. at 1947. However, this factor was significant because it differentiated the "drug tax" both from "taxes with a pure revenue-raising purpose" *and* "mixed-motive taxes that governments impose both to deter a disfavored activity and to raise money." *Id.* In other words, since taxes are not typically imposed upon criminal activities, this factor provided evidence that the drug tax only served punitive purposes.

In contrast, license suspensions or revocations are commonly predicated upon activities that are also illegal. *See, e.g., Sugarman, supra,* 273 Md. at 313–18, 329 A.2d 1 (finding willful assistance in evasion of income taxes to be grounds for disbarment of attorney); *Frank, supra,* 272 Md. at 535, 325 A.2d 718 (finding attempted bribery to be grounds for disbarment of attorney); *see also Loui, supra,* 889 P.2d at 705 (finding kidnapping and attempted sexual abuse to be grounds for revocation of license to practice medicine); *Schillerstrom, supra,* 180 Ariz. at 470–71, 885 P.2d at 158–59 (finding submission of false bills to be grounds for revocation of chiropractor's license). Since revocation or suspension of a license often occurs when the licensee acts in some way harmful to the public, it should not be surprising that the licensee's actions are sanctionable under the criminal justice system. This does not, however, mean that the license suspension seeks to "punish" the offender. When facts supporting a criminal sanction also reveal that allowing a licensee to keep his or her license would endanger the public, revocation or suspension of a license is fully in accord with a remedial purpose.

Jones's second argument, that § 16–205.1 is punitive because there is no basis for finding that Jones is an unsafe driver, is also without merit. Jones relies heavily upon *Motor*

*Vehicle Admin. v. Mohler,* 318 Md. 219, 567 A.2d 929 (1990), where we found that a single conviction for driving while intoxicated did not justify a finding that a driver was "unsafe" within the meaning of § 16–206 of the Transportation Article. In that case, however, we also noted that "the statutory development shows that the legislature meant to attach distinct meanings to 'unsafe,' 'unfit,' and the two 'habitual categories' " in § 16–206. *Id.* at 227, 567 A.2d 929. The question before us now is not whether Jones is an "unsafe" driver within the meaning intended by the legislature for § 16–206. Rather, the question before us is whether § 16–205.1 fairly serves the purpose of removing drunk drivers from Maryland's roads.

Nothing in the Double Jeopardy Clause requires that a statute operate with any specific degree of particularity. For double jeopardy purposes, an inquiry is made into the statute's *purpose,* not its breadth. If the class of individuals who fail or refuse to take breath or blood tests have an increased probability of driving while intoxicated, § 16–205.1 can fairly be said to serve the remedial purpose of maintaining safety on the public highways.[3] In finding that § 16–205.1 can fairly be said to serve this remedial purpose, we note that Jones was given probation before judgement for driving while intoxicated *twice* before he was stopped for driving while intoxicated in the instant case. As we see it, it is not unreasonable for the State to fear that drivers such as Jones may drive while intoxicated in the future.

In contrast to Jones's characterization of § 16–205.1, we think that this section and its application contain features consistent with a remedial purpose. If the defendant requests

---

**3.** The sole issue before us is whether § 16–205.1 constitutes punishment under the Double Jeopardy Clause, as incorporated through the Fourteenth Amendment. Thus, we need not decide whether § 16–205.1 is overbroad under either the Due Process or Equal Protection Clauses of the Fourteenth Amendment, although we note that such a challenge is unlikely to succeed. *See, e.g., Illinois v. Batchelder,* 463 U.S. 1112, 103 S.Ct. 3513, 77 L.Ed.2d 1267 (1983) (upholding Illinois's implied consent law against a due process challenge).

a hearing, the ALJ can in some circumstances modify the suspension period based upon the petitioner's need to drive for purposes of employment or alcohol treatment. The form used by the ALJ in making findings of fact at this hearing specifically notes that the ALJ must weigh "the adverse effect upon the petitioner's need to drive for employment or alcoholic prevention purposes versus the State's need to maintain safety on the public highways." Thus, the ALJ must specifically consider the remedial purpose behind § 16–205.1 in making the appropriate determination.

The fact that the suspension period may only be modified for offenders who have suffered neither a license suspension nor a drunk driving conviction in the past five years is not indicative of a punitive purpose. One can equally view the availability of a modification period for such "first offenders" as an attempt to lessen the "sting of punishment" for the group of drivers who the legislature thought would be least dangerous if allowed to continue driving. Similarly, elimination of this modification period for recidivists is consistent with the remedial goal of keeping the more dangerous drivers off the roads. The terms of § 16–205.1 provide no indication that it serves punitive, as opposed to remedial, purposes.

There is no merit to Jones's contention that the legislature's intent and the severity of the sanction imposed by § 16–205.1 demonstrate that this section only serves punitive, rather than remedial, purposes. We note that the Supreme Court in *Kurth Ranch* examined these factors, but only with a qualification: "We begin by noting that neither a high rate of taxation nor an obvious deterrent purpose automatically marks this tax a form of punishment." *Kurth Ranch, supra,* —— U.S. at ——, 114 S.Ct. at 1946. The Court, however, did note that "a high tax rate and deterrent purpose lend support to the characterization of the drug tax as punishment." *Id.* at ——, 114 S.Ct. at 1947. In this case, these factors at best support an argument that § 16–205.1 furthers both punitive *and* remedial goals.

Jones argues that the changes made to § 16–205.1 in 1989 demonstrate that the legislature intended the section to have punitive effect. Jones particularly notes that the 1989 revisions to § 16–205.1 included providing for longer license suspensions and reducing the discretion of ALJs to modify the length of a suspension period. These changes, however, merely evidence a legislative intent to suspend more drivers who drive while intoxicated for longer periods of time. These features of § 16–205.1 do not indicate whether the suspensions were intended to punish the drivers or were intended to keep potentially dangerous drivers off the road for a longer period of time and with greater certainty. The changes cited by Jones are consistent with either a remedial or punitive purpose.

On the other hand, the State places undue reliance on previous statements from this Court about the purposes of the drunk driving laws. The State correctly notes that "[w]e have consistently recognized that the statutory provisions enacted to enforce the State's fight against drunken driving ... were enacted for the protection of the public and not primarily for the protection of the accused." *Motor Vehicle Admin. v. Shrader*, 324 Md. 454, 464, 597 A.2d 939 (1991). The "protection of the public," however, may be advanced through the imposition of either remedial *or* punitive sanctions. In addition, our previous statements about the general purposes of the drunk driving laws *in toto* are of little help in determining the legislature's intent in enacting the specific provisions before us here. Our prior pronouncements on the general purposes of the drunk driving laws, therefore, are of little help.[4]

---

4. The dual nature of such pronouncements is amply demonstrated by *Willis v. State*, 302 Md. 363, 488 A.2d 171 (1985), where we noted that the General Assembly's goal in enacting the drunk driving laws was "to meet the considerable challenge created by this problem by enacting a series of measures to rid our highways of the drunk driver menace." *Id.* at 369–70, 488 A.2d 171. The State used this language to support its contention that the drunk driving laws were remedial, but neglected to read the next sentence in this opinion, which notes that "[t]hese measures ... are primarily designed to enhance the ability of prosecu-

Turning to the legislative history itself, we find that it demonstrates that both punitive and remedial purposes motivated the legislators in enacting the amendments that created § 16–205.1's administrative per se license suspension provisions. In *Johnson v. State*, 95 Md.App. 561, 570, 622 A.2d 199 (1993), the Court of Special Appeals conducted the same examination of legislative intent that we conduct here, and determined that "the bill [enacting the current version of § 16–205.1] appears to have a two-pronged purpose—first, to deter effectively those who would drive drunk, and second to reduce fatalities caused by those drunk drivers who drive while awaiting criminal adjudication." We find no reason to disagree with this conclusion.

The administrative per se license suspension law was first proposed in 1988, after the General Assembly established a Task Force on Drunk and Drugged Driving because "[t]he problem of drunk and drugged driving is of continuing concern to the citizens of the State of Maryland." Joint Resolution No. 15 of the Acts of 1988, *quoted in Shrader, supra*, 324 Md. at 460, 597 A.2d 939. As we noted in *Shrader*, the goals with which this Task force was charged included:

(1) Examining methods of increasing the effectiveness of the remedies currently available for combatting drunk and drugged driving;

(2) Examining remedies developed by other states and jurisdictions to deal with the problem of drunk and drugged drivers; [and]

(3) Recommending changes and additions to current laws and regulations dealing with drunk and drugged drivers.

*Id., quoted in Shrader, supra*, 324 Md. at 460, 597 A.2d 939. As an initial matter, we note the emphasis on "remedies" in the Task Force's goals, although we cannot give much weight to the use of the word "remedy" by itself.

---

tors to deal effectively with the drunk driver problem." *Id.* at 370, 488 A.2d 171.

In an interim report issued in 1988, the Task Force recommended that an "administrative per se law" be enacted,

which would provide "for the prompt suspension of the driver's license of an individual who, upon being detained by a police officer on suspicion of driving or attempting to drive while under the influence of alcohol or while intoxicated, either: 1) Refused to take a BAC [blood alcohol concentration] test; or 2) Submitted to the BAC test, and the results exceeded a statutorily defined limit." Task Force on Drunk and Drugged Driving, Interim Report to the General Assembly at 6 (1988).

*Shrader, supra,* 324 Md. at 460, 597 A.2d 939. As Jones correctly notes, the Task Force's Interim Report to the General Assembly emphasizes that the administrative suspension law "establishes an administrative process and penalty that is separate and distinct from any criminal process and penalty," that "the administrative process generally provides a sure penalty," and that "proponents claim that administrative per se is an effective deterrent to drunk driving." Task Force on Drunk and Drugged Driving, Interim Report to the General Assembly at 11–12. This language supports finding some punitive intent in proposing the administrative per se license suspension law, although we place no greater reliance on the use of the word "penalty" here than we place on the use of the word "remedy" in the statement of the Task Force's goals.[5]

In *Shrader,* we outlined the steps taken by the General Assembly following the issuance of the Task Force's report:

In 1989, the General Assembly enacted the administrative per se law recommended by the Task Force, rewriting § 16–205.1 of the Transportation Article to allow a person's driver's license to be promptly suspended for suspected drunken driving if the person refused a test for blood alcohol concentration. Ch. 284 of the Acts of 1989. The legislative history of Chapter 284 (House Bill 556) indicates

---

**5.** As the Supreme Court noted in *Kurth Ranch,* the Court "recognized in *Halper* that a so-called civil 'penalty' may be remedial in character." *Kurth Ranch, supra,* —— U.S. at ——, 114 S.Ct. at 1945.

that the General Assembly's desire for swift and certain action against drunk drivers was balanced with concern for the administrative needs of the MVA.

*Shrader, supra,* 324 Md. at 464, 597 A.2d 939. Jones notes that in hearings before the House Judiciary Committee on House Bill 556, some witnesses testified as to the deterrent effects of the administrative license suspension law. The Court of Special Appeals quoted some of this same testimony in *Johnson, supra,* 95 Md.App. at 570, 622 A.2d 199, to support its conclusion that the administrative suspension law serves both remedial and punitive purposes.

In *Johnson,* the Court of Special Appeals also quoted from a report on House Bill 556 prepared by the Governor's Legislative Office titled "Positive Aspects of Administrative Per Se." This report noted the deterrent effect of the proposed law, but also noted that it could lead to a reduction in fatal crashes and other remedial results. This report discussed the remedial purposes served by the proposed law, noting that "[s]peedy [a]dministrative sanctions would help the offender to recognize the cause and effect relationship between the offense and the sanction that would otherwise be weakened by lengthy delays," that "[i]t takes drunk drivers off the roads and it would save lives," and that "[q]uick Administrative Hearings could identify an individual who may be a problem drinker and result in alcohol treatments sooner than the delays caused by the court trial." *Johnson, supra,* 95 Md.App. at 569–70, 622 A.2d 199.

Without ascribing overriding importance to any particular piece of legislative history, we conclude that it is most likely that the legislature had both remedial and punitive purposes in mind when it amended § 16–205.1 in 1989. In assessing the importance of these various indicia of legislative intent, we must not place too much emphasis upon the casual use of words such as "punish," "deter," or "remedy." The Supreme Court has not treated the labels attached to a statute by the legislature as strong indicators of that statute's purpose. In *Kurth Ranch,* the Court characterized its use of such labels as follows:

*Halper* thus decided that the legislature's description of a statute as civil does not foreclose the possibility that it has a punitive character. We also recognized in *Halper* that a so-called civil "penalty" may be remedial in character if it merely reimburses the government for its actual costs arising from the defendant's criminal conduct.

*Kurth Ranch, supra,* —— U.S. at ——, 114 S.Ct. at 1945. As used in *Kurth Ranch,* the purposes ascribed to a statute by the legislature are at best *evidence* of the purposes a statute may fairly be said to serve.[6]

Our review of the legislative history of House Bill 556 leads us to conclude that two main goals motivated the legislature: the punitive goal of deterring future offenders and the remedial goal of removing suspected drunk drivers from the road. Therefore, although it is not possible to quantify how much weight should be given to the legislature's intent, it did generally intend that § 16–205.1 serve both remedial and punitive purposes.

■ Finally, we disagree with Jones's contention that the sanctions imposed by § 16–205.1 are sufficiently severe that they provide evidence that it imposes punishment. While in *Kurth Ranch,* the Supreme Court did use the severity of the sanction imposed by the "drug tax" as evidence that the tax

---

**6.** In his concurrence to *Halper,* Justice Kennedy outlined the dangers that would result from relying too closely on the legislature to determine the purposes served by a particular statute:

Today's holding, I would stress, constitutes an objective rule that is grounded in the nature of the sanction and the facts of the particular case. It does not authorize courts to undertake a broad inquiry into the subjective purposes that may be thought to lie behind a given judicial proceeding.... Such an inquiry would be amorphous and speculative, and would mire the courts in the quagmire of differentiating among the multiple purposes that underlie every proceeding, whether it be civil or criminal in name.

*Halper, supra,* 490 U.S. at 453, 109 S.Ct. at 1904 (citations omitted). Although the use of legislative intent in *Kurth Ranch* makes it clear that we must give *some* weight to the legislature's ascribed purposes, we keep in mind that the ultimate goal is to determine what purposes the statute may *fairly* be said to serve, not simply the purposes that some legislators or commentators desired the statute to serve.

was punitive, it noted that "[a] significant part of the assessment was more than eight times the drug's market value—a remarkably high tax." *Kurth Ranch, supra,* —— U.S. at ——, 114 S.Ct. at 1946. Jones argues that "the license suspension penalty is devastating to many drivers."[7] While this may be true, we are unable to find either the 45-day or one-year maximum suspensions provided by the statute to be "remarkably high." To the contrary, we agree with the Supreme Court of Ohio that the interests advanced in removing drunk drivers from the highways "are of such a nature and importance to society in general that the inconvenience occasioned by the temporary suspension of driving privileges pales by comparison." *City of Columbus v. Adams,* 10 Ohio St.3d 57, 461 N.E.2d 887, 890 (Ohio 1984).

### 3

Having determined (1) that license suspensions typically serve remedial purposes, (2) that § 16–205.1's language and structure are consistent with the remedial purpose of removing potentially dangerous drivers from the highways, and (3) that the legislature intended that § 16–205.1 serve both remedial and punitive purposes, we now consider whether the suspension of Jones's license can be justified solely by the remedial purposes served by the statute, or whether the suspension can only be explained if a portion of the license suspension is "punishment."

Jones argues that under *Kurth Ranch,* our inquiry must end with our finding that § 16–205.1 serves both punitive and remedial purposes because this finding mandates a conclusion that § 16–205.1 is "punishment" for purposes of the Double Jeopardy Clause. We disagree. In *Halper,* the Supreme

---

7. We only examine the maximum potential punishment insofar as it may be relevant in discerning the purposes served by the statute as a whole. In making this examination, it is important to restate that whether a sanction constitutes punishment is *not* determined from the defendant's perspective because even remedial sanctions carry the "sting of punishment." *Halper, supra,* 490 U.S. at 447 n. 7, 109 S.Ct. at 1901 n. 7.

Court examined a statute that served both punitive and remedial goals and determined that if the remedial goals by themselves justified the sanction imposed, then the statute did not impose a "punishment" for purposes of double jeopardy. *See Halper, supra,* 490 U.S. at 448–49, 109 S.Ct. at 1901–02. In our opinion, *Kurth Ranch* and *Austin* have not altered the *Halper* test.

It is true that the Supreme Court did not apply the *Halper* test in *Kurth Ranch* and *Austin.* We believe that the *Halper* test was not used in these cases because no remedial justification was found sufficient to justify *any* application of the statutes at issue in those cases. In *Austin,* the Supreme Court rejected the government's arguments that the *in rem* forfeiture served remedial goals. *Austin, supra,* —— U.S. at ——, 113 S.Ct. at 2811–12. The Court found that there was nothing criminal or dangerous in possessing the property that was seized, so the seizure removed no dangerous or illegal items from society. *Id.* In addition, there was no correlation between any penalty imposed under the statute and any damages incurred by the government or the cost of enforcing the law. *Id.*

The Court's treatment of the non-punitive justifications for Montana's drug tax in *Kurth Ranch* was similar. The Court rejected the argument that the tax served revenue-raising purposes because it was "too far-removed in crucial respects from a standard tax assessment to escape characterization as punishment." *Kurth Ranch, supra,* —— U.S. at ——, 114 S.Ct. at 1948. Montana never asserted that the drug tax served the remedial goals of recouping damages or the costs of investigation or prosecution. *Id.* The Court's treatment of the asserted non-punitive justifications given in *Austin* and *Kurth Ranch* leads us to conclude that in those cases, the asserted non-punitive purposes were not sufficient to justify *any* application of the statutes at issue. In contrast, we have found that § 16–205.1 serves the legitimate remedial purpose of removing potentially dangerous drivers from the Maryland highways.

Conducting the analysis laid out in *Halper*, we find that the remedial purpose of maintaining safety on the public highways amply justifies the maximum 45–day license suspension that § 16–205.1 may impose upon a driver who fails a blood or breath test. In reaching this conclusion, we note that the *Halper* analysis "will not be an exact pursuit" and that determining whether a sanction is justified by its underlying remedial purpose "inevitably involves an element of rough justice." *Halper, supra*, 490 U.S. at 449, 109 S.Ct. at 1902. It is for this reason that the Supreme Court in *Halper* declined to perform an exact balancing of the asserted remedial and punitive purposes served by the statute in that case. The Court simply asked whether the statute may be "fairly" said to be remedial, *id.* at 448, 109 S.Ct. at 1901–02, or whether the civil penalty bore a "rational relation" to the government's remedial goal. *Id.* at 449, 109 S.Ct. at 1902. It is also for this reason that the Court described *Halper* as "a rule for the rare case." *Id.* We do not find it unreasonable for the State to remove, for a 45–day period, the driver's license of someone who has failed a breath or blood test. The justification of keeping drunk drivers off the highways is sufficient to find a reasonable or "fair" connection between the remedial purpose and the length of the license suspension.

Finally, Jones argues that the question of whether the entire sanction is fairly justified solely by remedial purposes is a question of fact that must lie within the discretion of the trial court. In *Halper*, the Supreme Court left to the trial court "the discretion to determine on the basis of such an accounting [of the government's damages and costs] the size of the civil sanction the Government may receive without crossing the line between remedy and punishment." *Halper, supra*, 490 U.S. at 449, 109 S.Ct. at 1902. Such an approach, however, is not necessary here. *Halper* dealt with a potentially open-ended sanction and a remedial purpose resting upon underlying factual questions that will differ in each case: *i.e.*, the expenditures and damages suffered by the government as a result of each false claim. *See id.* In contrast, § 16–205.1 provides upper limits to the suspension period and its remedi-

al justification is the State's interest in maintaining safety on the highways. This justification will not vary from case to case, as would a calculation of damages.

We find that no factual issue is presented for which we must remand or defer to the trial court. Because the maximum 45–day suspension that could have been imposed upon Jones can be justified solely by § 16–205.1's remedial purposes, the ALJ could not have issued any sanction against Jones that would constitute "punishment" for double jeopardy purposes. As a result, there was no factual finding for the trial court to make with respect to the remedial purposes justifying § 16–205.1.

### III

Nor is Jones's prosecution for driving while intoxicated barred by Maryland's common-law prohibition against double jeopardy. It is true that under Maryland's common law a defendant cannot be "put in jeopardy again for the same offense—in jeopardy of being convicted of a crime for which he had been acquitted; in jeopardy of being twice convicted and punished for the same crime." *Gianiny v. State,* 320 Md. 337, 347, 577 A.2d 795 (1990); *see State v. Griffiths,* 338 Md. 485, 489, 659 A.2d 876 (1995). We need not decide, however, whether Maryland's common law contains a double-punishment analysis similar to that used in *Halper, Kurth Ranch,* and *Austin.*

It is unnecessary to decide that question at this time because Maryland's double jeopardy protection can be overridden by statute. "The rule against double jeopardy in Maryland is not established by the Constitution of the State but derives from the common law. The rule may be amended by the Legislature and a statute which is inconsistent with its common law scope and effect will prevail." *Ford v. State,* 237 Md. 266, 269, 205 A.2d 809 (1965). Thus, if we accepted Jones's assertion that the legislature intended to punish him under § 16–205.1, we would be constrained to find that the statute overruled the common-law double jeopardy protection, if any, to the extent of § 16–205.1's operation.

*JUDGEMENT OF THE CIRCUIT COURT FOR MONT-
GOMERY COUNTY REVERSED; CASE REMANDED TO
THAT COURT FOR FURTHER PROCEEDINGS CONSIS-
TENT WITH THIS OPINION; COSTS TO BE PAID BY
RESPONDENT.*